843 A.2d 1076

EMORY A. CRAFT, JR., PLAINTIFF–APPELLANT, v. STEVENSON LUMBER YARD, INC., DEFENDANT AND THIRD PARTY PLAINTIFF–RESPONDENT, v. MICHAEL A. ALADICH AND ANTHONY DITOMMAO, T/A ALADICH HOMES, THIRD PARTY DEFENDANTS.

DUBELL LUMBER COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ALADICH BUILDERS, INC., A NEW JERSEY CORPORATION; MICHAEL ALADICH, INDIVIDUALLY; JOSEPH DIMAIO AND CARLA DIMAIO; EMORY A. CRAFT, JR. AND KENNETH THEIL, DEFENDANTS.

Argued December 1, 2003—Decided March 23, 2004.

58

*Jonas Singer,* Mount Holly, argued the cause for appellant (*Wells, Singer, Rubin & Musulin,* attorneys; *Mr. Singer* and *Colleen A. McGuigan,* on the brief).

*Peter C. Lange, Jr.,* argued the cause for respondent Stevenson Lumber Yard, Inc.

*Charles F. Kenny,* River Edge, argued the cause for *amicus curiae* Building Contractors Association of New Jersey (*Peckar & Abramson,* attorneys; *Mr. Kenny and Craig H. Parker,* on the briefs).

*Edward M. Callahan, Jr.,* Roseland, argued the cause for *amicus curiae* Northern New Jersey Chapter, Inc., National Electrical Contractors Association (*Clancy, Callahan & Smith,* attorneys; *Mr. Callahan* and *Joseph A. Rizzo,* on the brief).

*Donald V. Feeley,* Westmont, submitted a letter in lieu of brief on behalf of respondent DuBell Lumber Company (*Rudd, McDonough and Feeley,* attorneys).

The opinion of the Court was delivered by

LONG, Justice.

This appeal presents us with an opportunity to revisit the Construction Lien Law, (CLL or Act), *N.J.S.A.* 2A:44A–1 to –38, a statute that was enacted primarily to secure payment for contractors, subcontractors, and suppliers who furnish labor or materials used to enhance the value of the property of others. The case involves a "lien claim" (*N.J.S.A.* 2A:44A–9), which constitutes the value of the labor or materials provided, and a "lien fund" (*N.J.S.A.* 2A:44A–10, 23), which is the measure of what is recoverable pursuant to a lien.

With respect to the lien claim, the question is whether an innocent property owner is liable to a supplier when the owner has paid his general contractor for supplies, which payments were transferred to the supplier without being earmarked, and were not recognized by the supplier as satisfying that property owner's account balance. We hold that a supplier has a duty to determine which of a contractor's projects is the source of its payment and to allocate the payment accordingly. Having failed in that duty, the supplier here was unable to verify the existence of a debt as required under the CLL and thus, no lien claim against the owner's property can be advanced.

Regarding the lien fund, at issue is the measure of the amount that is available to a subcontractor or supplier with a lien claim when the contractor has abandoned the job at a point at which the property owner has made all of the progress payments to date. We hold that the measure of the amount available to the lien

claimant in such circumstances is determined in accordance with *N.J.S.A.* 2A:44A–10 and –23 by subtracting the payments made to date from the "total contract price" agreed upon in writing by the parties.

I

Because the case comes to us on appeal from the grant of summary judgment in favor of the lien claimants, we view the facts in a light most favorable to the nonmoving party, the property owner. *R.* 4:46–2. So viewed, the facts are as follows: On March 18, 1998, plaintiff, Emory Craft, Jr. retained Aladich Builders, Inc. (Aladich) to construct a residence for him at a total cost of $220,000.00. In preparation for and during the job, Aladich purchased supplies from Stevenson Lumber Yard, Inc. (Stevenson), among others.[1] As the job progressed, Craft paid Aladich for labor and materials when payments became due. During the same period, Aladich had several construction projects ongoing and purchased building materials from Stevenson to supply all of its different jobs.

When Aladich made a payment to Stevenson and, more particularly, when it paid *Stevenson* the money it had received from Craft, Aladich did not specify for which construction project the payment was intended and Stevenson simply applied the payments to the oldest outstanding Aladich invoice.

Aladich eventually ceased working on the Craft job after Craft had paid $166,980.00. At that point, according to Craft, he owed Aladich nothing for the work that had been performed. Michael Aladich, the principal of Aladich, then filed for personal bankruptcy. Although the corporation did not file for bankruptcy, it was nonetheless insolvent by late summer of 1999 according to Michael Aladich.

---

[1] Included among Aladich's suppliers was DuBell Lumber Company.

On June 16, 1999, Stevenson filed a Construction Lien Claim against the real property owned by Craft in the amount of $53,019.59.[2] When Stevenson's lien claim was filed, Aladich owed it approximately $75,000 for all of the projects for which Stevenson had provided supplies.

In August 1999, Craft filed a Complaint against Stevenson demanding a judgment dismissing the Construction Lien Claim. Stevenson answered and counterclaimed, requesting that Craft's Complaint be dismissed and claiming the right to file the lien against Craft's property. In addition, in a Third Party Complaint, Stevenson sought judgment against Aladich for approximately $75,000. Craft answered Stevenson's Counterclaim, demanding dismissal. An arbitrator determined that Craft was not liable to Stevenson on the construction lien, and Stevenson requested a trial *de novo* pursuant to *Rule* 4:21A–6.

As the trial approached, Craft, Stevenson, and DuBell filed cross-motions for summary judgment—Craft to discharge the lien and Stevenson and DuBell to enforce it. The trial court ruled in favor of Stevenson and DuBell on the motions.

Craft appealed, challenging the legitimacy of Stevenson's lien claim and the existence of a lien fund in connection with the claims of both Stevenson and DuBell. The Appellate Division affirmed the grant of summary judgment in favor of Stevenson and DuBell. In so doing, the court recognized an inequity in the scheme, but held that, under the statute, the innocent homeowner must bear the financial burden caused by a defaulting contractor, despite paying for his supplies in full and despite having no knowledge that the contractor had outstanding accounts with its supplier.

[2] DuBell filed a construction lien claim against Craft on August 13, 1999, in the amount of $7,649.35 and later sued Aladich, Craft, and two other property owners demanding payment for building materials supplied to those properties. Craft answered, seeking dismissal of the complaint. Thereafter, DuBell's action was consolidated with Stevenson's.

We granted Craft's petition for certification. 177 *N.J.* 221, 827 *A.*2d 289 (2003). We also accorded *amicus curiae* status to the Building Contractors Association of New Jersey (BCA/NJ) and to the Northern New Jersey Chapter, Inc., National Electrical Contractors Association (NECA). We now reverse.

## II

Craft raises two fundamental arguments. First, there is no construction lien fund when a homeowner already has paid for all the work that has been completed, has not made advance payments for unperformed work, and the contractor has walked off the job over the homeowner's objection. Second, there is no construction lien claim when a supplier pyramids construction monies from one project to finance another.

Stevenson counters that, under the CLL, the lien fund in this case was the amount of the outstanding balance on the contract between Craft and Aladich at the time Stevenson's lien claim was filed (approximately $53,000), and that Aladich's later walk-off did not affect that calculation. DuBell joins in that argument. Stevenson also contends that, as a creditor, it was entitled to apply Aladich's payments to its account in any manner it chose so long as the payments were made without specific direction to the contrary.

BCA/NJ argues that a property owner who has paid its contractor in full for the work that has been completed cannot be subjected to the lien claims of suppliers under the CLL. In that respect, BCA/NJ contends that the contract amount between Craft and Aladich, for purposes of calculating the fund, should reflect valid adjustments. Specifically, because Aladich walked off the job after performing $166,980 worth of work, for which Craft had paid in full, that figure and not $220,000 is the "contract" amount. According to BCA/NJ, because Craft "owed" no money, no lien fund exists. Finally, BCA/NJ contends that in order to invoke the beneficial and extraordinary remedial provisions of the

CLL, creditors have a duty and obligation to allocate funds that are received to the projects from which they are derived.

NECA argues that the lien fund in this case is simply the total contract price between Craft and Aladich ($220,000) less any amounts that have been paid and that any other interpretation would misread the statute and pave the way for evisceration of the remedial lien fund concept. However, it agrees that a specific allocation requirement applicable to potential construction lien claimants should be imposed because the spirit of the CLL is violated when a lien claimant arbitrarily allocates payments received from one project to another.

## III

### A.

The CLL creates lien rights in real property designed to guarantee effective security to those who furnish labor or materials used to enhance the value of the property of others...." *Thomas Group, Inc. v. Wharton Senior Citizen Hous., Inc.*, 163 *N.J.* 507, 517, 750 *A.*2d 743 (2000). Because that remedy was unknown at common law and because it is exclusively statutory in origin, it has been held that the act must be strictly construed. *Baldyga Constr. Co. v. Hurff*, 174 *N.J.Super.* 616, 618, 417 *A.*2d 110 (App.Div.1980) (disagreeing with trial court's assumption that strict construction of mechanic's lien statutes may be "softened by the facts of a particular case"); *Apex Roofing Supply Co. v. Howell*, 59 *N.J.Super.* 462, 467, 158 *A.*2d 49 (App.Div.1960). That notion is something of an overstatement. Indeed, over 40 years ago, interpreting the predecessor Mechanics Lien Law, *N.J.S.A.* 2A:44–64 to 2A:44–104, 2A:44–106 to 2A:44–124.1, this Court parsed the statutory interpretation issue in a more nuanced way, reflecting the goals underpinning the law. *Friedman v. Stein*, 4 *N.J.* 34, 40–41, 71 *A.*2d 346 (1950) (holding provisions of act "giving rise" to lien to be subject to strict construction but provisions for enforcement by qualifying lien claimants to be

liberally construed to effectuate Law's purpose). Most recently, in *Thomas Group, supra,* we reaffirmed the approach in *Friedman v. Stein,* stating that the act is to be read "sensibly" and with "an understanding of the policies underlying the Lien Law." 163 *N.J.* at 515, 750 *A.*2d 743.

### B.

 The main purpose of the CLL—to help secure payment to contractors, subcontractors, and suppliers who provide work, services, material, or equipment pursuant to a written contract—is achieved by empowering them to file lien claims and thus protect the value of the work and materials they have provided. *Id.* at 517, 750 *A.*2d 743. A secondary goal of the Act is to ensure the rights of property owners who have met their financial obligations and to preclude imposing upon them the burden of double payment for work and materials. *Id.* at 521, 750 *A.*2d 743.

The Act states:

> Any contractor, subcontractor or supplier who provides work, services, material or equipment pursuant to a contract, shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price, subject to the provisions of sections 9 and 10 of this act. The lien shall attach to the interest of the owner in the real property.
>
> [*N.J.S.A.* 2A:44A–3 (footnote omitted).]

> . . .

> "Contract" means any agreement, or amendment thereto, *in writing,* evidencing the respective responsibilities of the contracting parties, which, in the case of a supplier, shall include a delivery or order slip signed by the owner, contractor, or subcontractor having a direct contractual relation with a contractor, or an authorized agent of any of them.
>
> [*N.J.S.A.* 2A:44A–2 (emphasis added).]

The Act limits the size of a lien claim to what is owed:

> The amount of a lien claim shall be limited to the contract price, or any unpaid portion thereof, whichever is less, of the claimant's contract for the work, services, material or equipment provided.
>
> [*N.J.S.A.* 2A:44A–9.]

It likewise limits the exposure of the property owner:

> Subject to the limitations of section 6 of this act, the lien claim shall attach to the interest of the owner from and after the time of filing of the lien claim. Except as

provided by section 20 of this act, no lien claim shall attach to the estate or interest acquired by a bona fide purchaser first recorded or lodged for record; nor shall a lien claim enjoy priority over any mortgage, judgment or other lien first recorded, lodged for record, filed or docketed. A lien claim filed under the provisions of this act shall be subject to the effect of a notice of settlement filed pursuant to P.L.1979, c. 406 (C. 46:16A–1 et seq.). Except as set forth in sections 15 and 21 of this act, *the maximum amount for which an owner will be liable for an interest in real property subject to a lien under this act for one or more lien claims filed pursuant to this act shall not be greater than:*

a. *In the case of a lien claim filed by a contractor, the total amount of the contract price of the contract between the owner and the contractor less the amount of payments made,* if any, prior to receipt of a copy of the lien claim pursuant to section 7 of this act, by the owner to the contractor or any other claimant who has filed a lien claim or a Notice of Unpaid Balance and Right to File Lien pursuant either to a contract with the contractor and any subcontractor or supplier, or a contract between a subcontractor of the contractor and any supplier or other subcontractor; or

b. *In the case of a lien claim filed by a subcontractor or supplier, the amount provided in subsection a. of this section, or the contract price of the contract between the contractor or subcontractor and the subcontractor or supplier, as applicable, pursuant to which the work, services, materials or equipment is provided by the subcontractor or supplier, less the amount of payments made,* if any, prior to receipt of a copy of the lien claim pursuant to section 7 of this act, to the contractor or supplier or any other claimant who has filed a lien claim or a Notice of Unpaid Balance and Right to File Lien pursuant to a contract with such subcontractor or supplier, whichever is less.

[*N.J.S.A.* 2A:44A–10 (footnotes omitted) (emphasis added).] [3]

Those two provisions operate to prescribe that an individual lien claim by a subcontractor or supplier can never be greater than the amount the claimant is owed and that, regardless of the amount owed to one or more claimants, the measure of the lien fund can never exceed the difference between the "total contract price in the owner's contract with the contractor" and the amount the owner has paid to the contractor as of the filing of the lien claim.

Not every payment to a contractor will concomitantly reduce the size of a property owner's lien fund. As the court in

---

[3] Section 10 of the CLL does not use the term "lien fund", however § 23, *N.J.S.A.* 2A:44A–23, refers to a "lien fund."

*Legge Industries v. Joseph Kushner Hebrew Academy,* 333 *N.J.Super.* 537, 549, 756 *A.2d* 608 (App.Div.2000), observed, there is no evidence that the Legislature intended to permit a property owner to defeat a supplier's lien claim by knowingly or negligently advancing payments to the contractor that are not due. Among the payments that will not qualify as reductions from the total contract price for a lien fund calculation are payments in violation of the contract provisions or other collusive payments and retainages, even when an owner is required to spend further money to complete construction. *Legge Indus., supra,* 333 *N.J.Super.* at 557, 756 *A.2d* 608 (holding that "lien fund" includes contractual retainage); *see also AEG Holdings, L.L.C. v. Tri–Gem's Builders, Inc.,* 347 *N.J.Super.* 511, 515, 790 *A.2d* 954 (App.Div.2002) (recognizing that "a property owner's maximum liability is not reduced by payments made to the contractor that were not earned and due before the subcontractor's lien was filed"). Only legitimate payments in accordance with the written contract and commensurate with performed work are considered as deductions from the total contract price. All other payments must be recaptured in determining the limit of the lien fund. *See generally Legge Indus., supra.* In so ruling, courts have carried out the intent of the Legislature to benefit contractors, subcontractors, and suppliers who furnish labor and materials by guaranteeing that the available lien fund is not improperly reduced or otherwise circumscribed.

▆▆▆▆ Under the CLL, a property owner is entitled to identify all parties who may have lien rights in connection with its particular project by serving a demand for a verified list upon its contractor. The contractor, in turn, must provide a list, under oath, of all parties with such lien rights or risk liability for damages, including costs and attorney's fees, to discharge a lien asserted by a party whose name is omitted. *N.J.S.A.* 2A:44A–37. The purpose of that provision is not necessarily to devolve any policing duties on the property owner but to assure the owner of the universe of potential lien claimants. An owner also may require a contractor to obtain lien waivers from subcontractors

and suppliers as they are paid, *N.J.S.A.* 2A:44A–38, but under the CLL such waivers are not considered essential because the property is protected to the extent that payments the owner has made are subtracted from the total contract price in measuring the lien fund. *Legge Indus., supra,* 333 *N.J.Super.* at 549, 756 *A.*2d 608; Robert S. Peckar, Richard M. Baron & Edward M. Callahan Jr., *New Jersey's New Construction Lien Law: A Practical Guide to the New Law with Forms, in New Jersey Institute for Continuing Legal Education, The New Construction Lien Law* 28–29 (1994).

Upon receipt of a notice of lien claim, the owner is authorized to "withhold and deduct the amount claimed from the unpaid part of the contract price that is or may become due and payable to the contractor ..." and may pay the lien claimant directly, which payment "shall constitute a payment made on account of the contract price...." *N.J.S.A.* 2A:44A–12.[4] That section, which is derived from the original Mechanics Lien Law reveals that the intent of the CLL is to protect subcontractors and suppliers by securing payment of the claims out of the money due from the owner to the contractor. *See St. Michael's Orphan Asylum and Indus. Sch., Hopewell, N.J. v. Conneen Constr. Co.,* 114 *N.J. Eq.* 276, 13 *Backes* 276, 166 *A.* 458 (N.J.Ch.1933), *affirmed by* 115 *N.J. Eq.* 334, 170 *A.* 649 (1934).

The procedures for filing a lien claim are detailed in the CLL. *N.J.S.A.* 2A:44A–6. Because they play no part in our inquiry, they need not be recounted here except insofar as the statute requires that a "lien claim shall be signed, acknowledged and verified by oath of the claimant" and filed within 90 days following the date of the provision of the last labor or materials for which the payment is claimed.[5] *Ibid.* Insuring the validity and timeli-

---

[4] The contractor may challenge such payment under the statute on the ground that no money is owed the claimant.

[5] The record suggests that the reason Stevenson filed a lien claim only against Craft is that it was out of time in connection with the other outstanding Aladich accounts.

ness of lien claims is critical under the CLL. That is why the claim is supported by an oath and why penalties are provided for filing an invalid lien or otherwise failing to satisfy the statutory procedures. *See, e.g., N.J.S.A.* 2A:44A–15 (requiring forfeiture of lien rights if claims are improper and overvalued). That is the backdrop for our inquiry.

## IV

We turn first to Stevenson's lien claim which is contested by Craft.[6] On the motion for summary judgment, Craft contended that he paid Aladich for labor and materials as the bills became due and that Alädich, in turn, paid Stevenson. Aladich also attested to those facts and Stevenson did not dispute them. Given the summary judgment standard, *R.* 4:46–2, Craft's evidence should, at the very least, have been sufficient to defeat Stevenson's motion because it presented a genuine issue of material fact regarding whether Craft owed anything to Stevenson to justify a lien claim. Instead, Stevenson successfully argued that, as a matter of law, because Aladich did not earmark Craft's payments, Stevenson was free to apply them as it saw fit to outstanding Aladich accounts.

As a general proposition, a creditor who is owed more than one debt by a debtor may apply the payments to the debtor's account in any manner it chooses so long as the debtor has not issued specific directions to the contrary. That is known as the payment application rule. *United Orient Bank v. Lee,* 208 *N.J.Super.* 69, 72 n. 1, 504 *A.*2d 1215 (App.Div.1986) ("Where . . . the obligor has made no direction, the creditor may with certain exceptions apply the payment as he wishes."); *Borough of Totowa v. Am. Sur. Co. of N.Y.,* 39 *N.J.* 332, 338, 188 *A.*2d 586 (1963) (explaining that if debtor does not direct payment to satisfy certain debts with creditor, creditor may apply payment as it sees fit). However, that "somewhat mechanical common law rule" is

---

6 Craft does not challenge the validity of DuBell's lien claim.

not absolute. *Hiller & Skoglund, Inc. v. Atl. Creosoting Co.*, 40 *N.J.* 6, 10, 190 *A.*2d 380 (1963).

In *Hiller*, this Court was faced with a situation that was like the one before us. Hiller was a prime contractor on a construction job and hired the Universal Pile Co., Inc. as a subcontractor. During the course of the construction, Universal purchased materials for several jobs, including Hiller's, from the Atlantic Creosoting Company, Inc. After completion of the subcontract, Hiller made payments to Universal that were owed to Atlantic for supplies. However, Universal did not earmark the funds it paid to Atlantic as intended to satisfy the Hiller account. Atlantic, in turn, used the funds to satisfy the earliest unpaid items on Universal's account that belonged to other contractors. As a result, Atlantic filed a lien claim under the former Mechanics' Lien Law against Hiller asserting a lien for the materials it had supplied. In resolving the issues in *Hiller*, Justice Hall recognized, in that cognate context, that the *Restatement of Contracts* (1932) "somewhat tempers the rigid right of debtor and creditor to apply payments without regard to the interests of third parties and makes some accommodation to the natural feeling of injustice which gave rise to the contrary line of authority." [7] *Id.* at 17, 190 *A.*2d 380; *see generally Restatement of Contracts* §§ 387, 388, 389. The Court stated:

> If the payor is under a duty to a third person to devote money paid by him to the discharge of a particular debt the payment must be so applied if the creditor knows, or has reason to know, of the payors duty, in spite of the fact that the payor directs that the payment shall be applied to the discharge of another debt.... * * * [T]he creditor cannot apply the payment * * * to the exclusion of a claim, failure to discharge which, with the money then paid, will, as the creditor knows or has reason to know, violate a duty owed by the debtor to a third person, whether that duty arises from a fiduciary relation or from a contract. These limitations presuppose that the debtor shall be under a contract with the third person, not merely to pay a particular debt, but to devote to that debt the very money with which payment was made.

---

[7] Ultimately, the determination in *Hiller* turned on the public nature of the project as governed by specific provisions of the trust fund act. *N.J.S.A.* 2A:44–148.

[*Hiller, supra,* 40 *N.J.* at 17–18, 190 *A.*2d 380 (citing *Restatement of Contracts* (1932)).]

 The present version of the *Restatement (Second) of Contracts* (1981) provides:

§ 258. Obligor's Direction of Application

(1) except as stated in Subsection (2), as between two or more contractual duties owed by an obligor to the same obligee, a performance is applied according to a direction made by the obligor to the obligee at or before the time of performance.

(2) If the obligor is under a duty to a third person to devote a performance to the discharge of a particular duty that the obligor owes to the obligee and the obligee knows or has reason to know this, the obligor's performance is applied to that duty.

. . . .

§ 259. Creditor's Application

(1) Except as stated in Subsection (2) and (3), if the debtor has not directed application of a payment as between two or more matured debts, the payment is applied according to a manifestation of intention made within a reasonable time by the creditor to the debtor.

(2) *A creditor cannot apply such a payment to a debt if*

 (a) *the debtor could not have directed its application to that debt,* or (b) a forfeiture would result from a failure to apply it to another debt and the creditor knows or has reason to know this, or (c) the debt is disputed or is unenforceable on grounds of public policy.

. . . .

§ 260. Application of Payments Where Neither Party Exercises his Power

(1) *If neither the debtor nor the creditor has exercised his power with respect to the application of a payment* as between two or more matured debts, *the payment is applied to debts to which the creditor could have applied it with just regard to the interests of third persons,* the debtor and the creditor.

[*Restatement (Second) of Contracts* §§ 258, 259, 260 (emphasis added).]

Together those sections negate any notion that the payment application rule gives every creditor under every circumstance carte blanche to apply payments as it sees fit. When, as here, the creditor knows or should know that a debtor is under an obligation to a third party to devote a relevant payment to discharge a duty the debtor owes to the third party, the payment must be applied to do so regardless of the debtor's instruction or lack thereof. Indeed it is the relationship of the parties that is the critical factor. As Justice Hall observed in *Hiller, supra,* in the construction industry

business is customarily done on credit—the promise the industry lives by. The prime contractor expects to pay his subcontractor from installment payments received from the owner and the materialman depends on the subcontractor to make payment out of the money the latter has received. Each party in the chain fully realizes what business practice requires of him and business stability depends on conformity even when the going becomes rough.

[40 *N.J.* at 24, 190 *A.*2d 380.]

■ The owner likewise has a right to expect that his payments to the contractor will funnel down to those whose work or materials enhanced the value of his property. That is likely why the Sponsor's Statement to the bill that became the CLL characterized funds received by a contractor in connection with a contract for an improvement of real property as assets of a "trust" that are intended to

[i]nsure[ ] that construction funding actually ends up going to suppliers, subcontractors and contractors who work on the improvement; provides for severe penalties and personal liability upon anyone diverting· these assets from their proper construction purposes; *eliminates the age-old problem of "pyramiding" in which construction monies from one project are used to finance other jobs; reduces the possibility of fraud by requiring separate record-keeping for each construction project;* and facilitates honesty and fair dealing by allowing frequent examination and copying of books and records dedicated to each construction project.

[Sponsor's Statement to *L.* 1993, *c.* 318 (emphasis added).]

Just as Aladich owed a duty to those below him in the construction chain to pay them what Craft had remitted for their services, it likewise owed a duty to Craft to apply his payments to his bill. That duty was violated when Aladich neglected to earmark Craft's payments for application by Stevenson. However, that did not empower Stevenson to apply Aladich's payments to advance its own financial interests. Stevenson knew of the Craft project because it delivered supplies there. It also knew that Aladich, like all contractors, essentially was a conduit for the property owners' payments. Consequently, it knew that those payments had to be applied to reduce the property owners' particular indebtednesses. Within the terms of the Restatement, Stevenson knew or had reason to know that it was not free to apply Aladich's payments at will. *Restatement (Second) of Contracts* § 258. Aladich could not have directed the application of Craft's payment to any but Craft's

obligations without breaching its duty to Craft, and Stevenson likewise was obligated to ascertain the source of Aladich's payments and to apply them accordingly. *Id.* at §§ 259, 260. As we said in *Hiller*:

> The law ought to be based on people, especially those regularly engaged in business, doing the proper and conscionable thing. Those acting properly and in good faith should not be penalized through technical considerations where the party who urges the bar is guilty of conscienceless conduct.
>
> [40 *N.J.* at 24, 190 *A.*2d 380.]

 Importantly, Stevenson had a statutory duty to allocate Aladich's payments to the accounts from which they were derived if it wished to file a lien claim. To satisfy the CLL requirement that liens be accurate and valid, a lien claimant must attest under oath that a debt is owed. The only way that can occur is for the lien claimant to maintain accurate records in which the funds received for payment are applied to the proper accounts. That conclusion conforms with the way in which the construction business presently operates. Subcontractors and suppliers are well aware of where their labors or materials have been expended. Indeed, this record is replete with Stevenson's own invoices reflecting deliveries to the Craft construction site. Just as it kept a record of what it provided to Craft, Stevenson was obligated to keep a record of what it received from Craft and other owners.

Having failed to allocate Aladich's payments to the accounts from which they were derived, and thus being unable to state under oath that Craft owed it a debt in a particular amount, Stevenson had no basis for filing a lien claim. The summary judgment entered in its favor therefore must be reversed and summary judgment granted to Craft on the lien claim.

 We note that "nothing in [the CLL] shall be construed to limit the right of any claimant from pursuing any other remedy provided by law." *N.J.S.A.* 2A:44A–3. The CLL remedy is "cumulative" to other available remedies. As the Appellate Division stated recently in *Groesbeck v. Linden*, 321 N.J.Super. 349, 729 *A.*2d 47 (N.J.Super.A.D.1999):

> The [CLL] was not designed or intended to be the exclusive remedy of an unpaid contractor.
>
> . . . .
>
> [A] contractor does not lose his traditional common law contract remedy for unpaid services by his initial resort to seek a lien pursuant to the terms of the [CLL]. It is not mandatory that an unpaid contractor who initially seeks a lien to follow through, fulfill and satisfactorily complete the lien claim procedure provided by the [CLL]. Since the [CLL] is not intended to be the exclusive remedy for an unpaid contractor, a contractor may forego the legal effect and certainty represented by a lien and pursue other available remedies.
>
> [321 *N.J.Super.* 349, 353–54 (1999); *see also Orefice v. ADR,* 315 *N.J.Super.* 493, 497–98, 719 *A.*2d 169 (App.Div.1998) (quoting CLL language of *N.J.S.A.* 2A:44A–3).]

Put another way, Stevenson, who accepted Craft's statement of facts only for the purpose of the summary judgment motion with respect to the lien, can exercise other means to recoup payments for the supplies it delivered to Aladich sites including suing Aladich, Craft, and all other owners for the benefit of whose property it delivered supplies.

## V

We turn next to the issue of the lien fund that requires our attention in connection with DuBell's lien claim. Craft does not dispute that claim other than challenging the existence of a lien fund. As we have said, under the CLL, the lien fund essentially is the measure of a lien claimant's entitlement. The Act is clear in stating how the fund is measured. It is the "total amount of the contract price ... less any payments made." *N.J.S.A.* 2A:44A–10. The contract price is the beginning point for a determination of the measure of a lien fund because it is within the four corners of that contract that the contractor, the subcontractors, and suppliers provide services or materials to enhance the value of the owner's property. Likewise, the amount remaining unpaid on that contract is the measure of the fund.

Thus, when a contractor has performed and the owner has failed to pay him, the entire contract price is the limit of the lien fund. *N.J.S.A.* 2A:44A–10. Similarly, when the owner has

paid the contractor a portion of the contract price, the owner's property is protected to the extent of the progress payments. *Id.; see also Legge Indus., supra,* 333 *N.J.Super.* at 549, 756 *A.*2d 608. Thus, for example, on a $500,000 contract, if an owner has paid the contractor $400,000, the lien fund cannot exceed the $100,000 that is due the contractor, regardless of how many lien claims are outstanding. Once the contract costs fully are paid by the owner, there is no fund against which to measure an unpaid lien claimant's entitlement because nothing is owed. Whether the owner has paid a small amount, a large amount, or all of the contract price, he will receive full credit. That is what is meant by the notion of avoiding double payment—that the lien fund will never include what the owner has already legitimately paid.

A few other observations are in order. Craft's efforts to cast himself as the less sophisticated and thus the "more innocent" party, simply by virtue of his status as a property owner, are not helpful to our disposition. Institutionally, property owners run the gamut from large scale developers to individuals building personal homes. Contractors and suppliers likewise can be national corporations or one-person shops, eking out an existence. The rule of law we enunciate will apply to all of them. Although the specifics of an individual case may reveal that one party is, in fact, less innocent than the other, the mere status of the parties as owners versus contractors and suppliers does not weigh on the equity scale.

The parties' remaining efforts to cast each other as "less innocent" and themselves as "more deserving" are equally unpersuasive. To be sure, the CLL provides some options that might have avoided this situation. For example, the owner could have required lien waivers, *N.J.S.A.* 2A:44A–38. Likewise, the supplier simply could have refused to extend any credit whatsoever to the contractor, requiring cash on delivery. We do not view the availability of those options as affecting the equities in a case arising in an industry that historically and essentially lives on promises and credit. *Hiller, supra,* 40 *N.J.* at 24, 190 *A.*2d 380.

In the absence of a claim of improper dealing, which is not alleged here as between Craft and DuBell, both parties are innocent for purposes of our analysis. We thus are faced with the necessity of determining not right against wrong but right against right. However we interpret the CLL, one party will be in the unenviable position of attempting to recover its losses through Aladich.

We turn now to the parties' dueling interpretations of the lien fund provision. Craft, supported by BCA/NJ, argues that there is no lien fund when a contractor walks off a job at a point at which progress payments and work are in balance. According to those parties, in such circumstances, the owner may declare the contract "over," effectively reforming the "total contract price" to reflect what has been paid to date. In other words, the homeowner has paid fully for the value of the work and materials that have enhanced the value of the property. Because the total contract price has been satisfied fully under that analysis, and nothing is owed, no lien fund exists. Any other outcome, they aver, would require the owner to "pay twice" contrary to the goals of the CLL. In effect, the result would be to turn the homeowner into a surety for the subcontractor.

Stevenson, DuBell, and NECA disagree. They counter that, in order to carry out the primary goal of the CLL, which is to protect subcontractors and suppliers, the statute makes the total written contract price minus legitimate payments the immutable measure of a claimant's lien rights. In support of that view they rely on the language of the CLL and on the goals underlying the Act.

We think the owner has the better of the argument. In reaching our conclusion, we recognize that this situation is not a wholly comfortable fit within the provisions of the CLL. For example, as we have observed, the statute defines "contract price" as the amount "specified in [the] contract," and "contract," in turn, "means any agreement, or amendment thereto, in writing...." *N.J.S.A.* 2A:44A-1. Here the amount specified in the written contract is $220,000.00, of which Craft paid $166,980.00. No

amendment to the contract in writing or otherwise was executed. Rather, Aladich walked off the job without notice and Craft attempted to declare the contract "reformed." Thus, it would be fair to say that the facts do not fit squarely within the CLL template.

However, it is also true that the remedy limned by the CLL, in derogation of the common law, is a very specific one. Its focus is not simply on securing payment for subcontractors and suppliers. If that were the case, the lien fund would not be limited. Rather, the CLL remedy strikes a balance between the interests of owners, subcontractors and suppliers by securing payment *from the moneys owed by the owner to the contractor. N.J.S.A.* 2A:44A–12. That is pivotal because it allows a lien encumbrance only to the extent that the owner is indebted to the contractor and provides the owner with the right to use that money to pay the unpaid subcontractors and suppliers directly. *N.J.S.A.* 2A:44A–12. Once those limits on the CLL remedy are taken into account, it seems clear that in any case in which no money is owed by an owner to a contractor, no lien fund exists.

For the purposes of the motion for summary judgment on the lien claim, all parties agreed that although Aladich and Craft did not alter their contract price in writing, that Aladich was fully paid for the work it performed, that it refused to perform further work, and that Craft thus owed it nothing. To us, that is the heart of the matter. Because the lien fund can only be based on what is actually owed, when nothing is owed there can be no fund.

The suppliers' reliance on the Appellate Division's decision in *AEG Holdings* and *Legge Industries* is misplaced.[8] To be sure, those cases properly recognize that generally, when choosing between two innocent parties under the CLL, it is the lien holder who prevails. However, what the supplier fails to take account of is that that principle is the tie-breaker between equally plausible

---

[8] As we have indicated, both *Legge* and *AEG*, involving as they do, retainages and unauthorized prepayments, are wholly distinguishable from this case.

interpretations of the Act. Where, as here, one interpretation advances the principles undergirding the Act, and one does not, it is the better interpretation that must prevail, regardless of the outcome.

We think that approach is a sound one. Our mission is to determine what the Legislature would have intended the outcome to be had it been faced with this specific circumstance. Our guides are the statutory language and the goals underlying the Act. So directed, we hold when a contractor walks off a job at a point at which he has been paid to date and is owed no money by the owner, there is no lien fund.

## VI

The judgment of the Appellate Division is reversed. The case is remanded for the entry of judgment in favor of Craft declaring that no lien fund exists in this case.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—6.

Opposed—None.