**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3492-18T1

EASTERN CONCRETE
MATERIALS, INC.,

    Plaintiff-Respondent,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, AS SURETY OF KRE
HAMILTON URBAN RENEWAL
LLC, and INDUSTRIAL URBAN
CORPORATION,

    Defendants,

and

ENGINEERED DEVICES
CORPORATION,

    Defendant/Third-Party
    Plaintiff,

v.

LIBERTY MUTUAL INSURANCE
COMPANY AS SURETY OF
CLAREMONT CONSTRUCTION
GROUP, and CLAREMONT

CONSTRUCTION GROUP, INC.,

    Third-Party Defendants-
    Appellants.

_____

Argued March 2, 2020 – Decided April 24, 2020

Before Judges Sumners, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3241-17.

John H. Klock argued the cause for appellants (Gibbons PC, attorneys; John H. Klock, of counsel and on the briefs).

Craig W. Miller argued the cause for respondent.

PER CURIAM

In this construction lien case, third-party defendants Liberty Mutual as surety for Claremont Construction Group and Claremont Construction Group, Inc. (collectively Claremont) appeal from a March 20, 2019 judgment entered following a jury verdict in favor of plaintiff Eastern Concrete Materials, Inc. (Eastern). We affirm in part and reverse and remand in part.

We first identify the parties involved in this project to construct two residential seventeen-story interconnected towers (the Marin Project) on property owned by defendant KRE Hamilton Urban Renewal LLC (KRE) in Jersey City. KRE hired Claremont as the general contractor for the Marin

Project.  Claremont subcontracted with defendant Industrial Urban Corporation (IUC) to provide all cast-in place concrete work for the Marin Project.  IUC, in turn, engaged Eastern to supply the ready-mix concrete and third-party plaintiff Engineered Devices Corporation (EDC) to supply material and equipment.

Prior to entering into the agreement with Claremont, IUC executed a promissory note in the amount of $2,645,736.71 in favor of Eastern.  The Claremont-IUC contract was in the amount of $11,050,000.  Under the terms of the agreement, IUC was required to "pay for material, equipment and labor used in connection with the performance of th[e] [s]ubcontract through the period covered by previous payments received from [Claremont]."

As the work progressed, IUC submitted formal requests for payment to Claremont.  By January 2017, IUC had submitted twelve applications for payment that totaled $11,175,337, including approved change orders, with $11,007,667 worth of work reported as completed.  In each application, IUC certified that all work (materials and labor) had been paid through the previous applications.  Claremont paid IUC $10,445,167, retaining five percent ($552,500) in accordance with the subcontract.  The purpose of the retainage was to "cover costs of items to be completed or corrected by the

[s]ubcontractor."  No further payment applications were made by IUC to Claremont.

On March 3, 2017, Claremont received an email from Eastern claiming it was owed $791,188.32 for concrete delivered to the Marin Project.  Claremont alleged this was the first notice it received that Eastern had not been paid for the past eight or nine months.  Thereafter, the parties adopted a joint payment procedure.  Claremont also claimed IUC had not completed its work.  There were no further joint checks issued after a May 2017 meeting.

In May 2017, EDC filed a construction lien for $89,305.08 against KRE. On June 22, 2017, Eastern filed a construction lien for $784,466.40 against KRE. Liberty Mutual Insurance Company filed lien bonds as surety for Claremont.  As a result, the Marin Project property was released from the liens and KRE was removed.[1]

In August 2017, Eastern filed this action against KRE and IUC, seeking to enforce its construction liens.  That same month, Eastern filed an amended complaint that added EDC as a lienor party.  EDC subsequently joined Claremont as a third-party defendant.

---

[1]  KRE subsequently moved to dismiss plaintiff's amended complaint pursuant to Rule 4:6-2(e).  A December 4, 2017 order dismissed Eastern's complaint against KRE without prejudice.

The jury trial commenced on February 26, 2019. Before jury selection began, EDC and Claremont settled their matter for $50,000 on its construction lien claim of $89,305.08. Additionally, IUC announced it would not participate in the trial and assigned its affirmative claims to Eastern without objection by Claremont.

Claremont's defense theory was that IUC improperly diverted funds from the Claremont-IUC contract to pay off the promissory note owed to Eastern.

At the close of the evidence, Claremont moved for judgment under Rule 4:40-1. The trial judge denied the motion, noting the lack of evidence that the Claremont payments, deposited into IUC's operating account, "was the only money available to pay their other obligations." Thus, the court found no evidence that IUC did not use its own funds to pay the IUC-Eastern note. Based on the testimony, the judge characterized Claremont's assertion as mere "belief and suspicion." The judge permitted Claremont to

> argue to the extent there's sufficient evidence in the record that while Claremont was paying [IUC], [[IUC], for whatever reason, wasn't paying Eastern, but beyond that speculating on what they were . . . doing with the money that they got from Claremont, . . . I don't think there's enough evidence in the case . . . to permit you to ask the jury to infer that they were diverting the funds.

A-3492-18T1

The judge concluded the evidence did not support Claremont's contention that Eastern "failed to do their due diligence on the payments that they did get."

The jury returned a verdict against Claremont for the unpaid $781,611.40 worth of concrete Eastern supplied for the Marin Project. The jury found the amount due to IUC on the subcontract, was $708,279, "consisting of the $552,500 retainage plus $155,279 for completed and unpaid approved work and purchased materials."

On March 20, 2019, the trial judge entered a judgment for $658,277.84 (the lien fund amount less the $50,000 settlement reached between Claremont and EDC). On March 29, 2019, the judge entered a default judgment against IUC, awarding Claremont $236,211 for work IUC failed to complete. This appeal followed.

Claremont raises the following points for our consideration:

> I. IDENTIFICATION OF THE SOURCE OF FUNDS IS REQUIRED BY CRAFT[2] AND UNDERLIES THE RATIONALE FOR THE LIEN ACT.
>
> > A. THE COURT ERRED IN NOT ADMITTING THE REQUEST FOR ADMISSIONS OF IUC.
> >
> > B. CRAFT REQUIRES THE SUPPLIER OR VENDOR TO ASCERTAIN THE SOURCE OF

---

[2] Craft v. Stevenson Lumber Yard, Inc., 179 N.J. 56 (2004).

A-3492-18T1

FUNDS, BUT THE COURT ERRONEOUSLY PLACED THE BURDEN ON CLAREMONT.

C. THE COURT ERRONEOUSLY DIRECTED CLAREMONT NOT TO ARGUE COLLUSION IN CLOSING.

II. THE LIEN ACT CALLS FOR [THE] COURT TO DETERMINE THE LIEN FUND AND FURTHER WHERE THE LIEN FUND ARISES FROM A CONTRACT TO INTERPRET THE CONTRACT.

III. COURT ERRED IN ALLOWING [EASTERN] TO ATTEMPT TO PROVE ALLEGED CLAIMS THAT IUC DEFAULTED ON.

IV. CLAREMONT IS ENTITLED TO PARTICIPATE IN THE LIEN FUND.

V. THE COURT ERRED IN MAKING THE JUDGMENT PRO TANTO INSTEAD OF PRO RATA.

"A jury verdict is entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977)).

A-3492-18T1

The primary purpose of the Construction Lien Law, N.J.S.A. 2A:44A-1 to -38, is to secure payment to subcontractors and others "who provide work, services, material, or equipment, pursuant to a written contract." NRG REMA LLC v. Creative Envtl. Sols. Corp., 454 N.J. Super. 578, 587 (App. Div.) (quoting Craft, 179 N.J. at 68), certifs. denied, 234 N.J. 577 and 235 N.J. 111 (2018). The "secondary purpose is to 'protect owners' against paying more than once for the same work or materials." L & W Supply Corp. v. DeSilva, 429 N.J. Super. 179, 183 (App. Div. 2012) (quoting Labov Mech., Inc. v. E. Coast Power, L.L.C., 377 N.J. Super. 240, 245 (App. Div. 2005)).

Under the Construction Lien Law, a lien fund exists if a property owner has paid the general contractor less than the value of the work completed. N.J.S.A. 2A:44A-9(a). A lien fund is limited to "the earned amount of the contract between the owner and the contractor minus any payments made prior to service of a copy of the lien claim." N.J.S.A. 2A:44A-9(b)(1). "[N]o lien fund exists, if, at the time of service of a copy of the lien claim, the owner . . . has fully paid the contractor for the work performed . . . ." N.J.S.A. 2A:44A-9(d); see also Craft, 179 N.J. at 80 ("Because the lien fund can only be based on what is actually owed, when nothing is owed there can be no fund.") A property owner "should never be subject to liens in an amount greater than the amount

unpaid by the owner to its prime contractor at the time the lien claim is filed." Labov, 377 N.J. Super. at 240.

## DENIAL OF ADMISSION OF REQUESTS FOR ADMISSION

Claremont moved to admit into evidence the request for admissions served on IUC. In those requests, IUC admitted that it "never identified to [Eastern] the source of the funds used for any payment to [Eastern] during the period from" May 2016 to June 2017 and that "[Eastern] never requested IUC to identify the source of funds in any payment by IUC to [Eastern]" during that period. Claremont sought to introduce the requests for admission in support of its defense theory that IUC improperly diverted funds from the Claremont-IUC subcontract to pay off the promissory note entered into between IUC and Eastern for work unrelated to the Marin Project, and that Eastern turned a blind-eye. The court excluded the requests for admission from evidence because it was not referenced by any witness during trial.

Claremont argues the court erred in excluding the requests from evidence because "those admissions conclusively established the facts without the need for any additional testimony." We disagree.

We owe "substantial deference to the evidentiary rulings of a trial judge." Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 319 (2006) (citing DeVito v.

<u>Sheeran</u>, 165 N.J. 167, 198 (2000)).  Our review "is limited to examining the decision for abuse of discretion," <u>Hisenaj v. Kuehner</u>, 194 N.J. 6, 12 (2008), "i.e., [that] there has been a clear error of judgment," <u>Griffin v. City of East Orange</u>, 225 N.J. 400, 413 (2016) (alteration in original) (quoting <u>State v. Brown</u>, 170 N.J. 138, 147 (2001)).  "Thus, we will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" <u>Griffin</u>, 225 N.J. at 413.  (quoting <u>Green v. N.J. Mfrs. Ins. Co.</u>, 160 N.J. 480, 492 (1999)).

"Any matter admitted under [<u>Rule</u> 4:22] "is conclusively established unless the court on motion permits withdrawal or amendment of the admission." <u>R.</u> 4:22-2.

Here, Claremont served the requests for admissions on IUC, not Eastern. Although IUC responded to the requests and admitted those facts, it defaulted prior to trial.  Claremont sought to establish the subject matter of the requests by admitting them in evidence against Eastern in support of its collusion theory. In that regard, Claremont maintains that IUC made nine monthly payments totaling $880,878.90 to Eastern on account of the promissory note it executed the month before IUC entered into the contract with Claremont.  Claremont contends IUC admitted that it never identified to Eastern the source of the funds

10

used to make the promissory note payments and, pursuant to Rule 4:22-2, the admissions conclusively established those facts without the need for any additional testimony.

Claremont cites no authority for the proposition that responses to requests for admissions by one party that later defaults are admissible at trial and binding on a different party. We are aware of no such authority. Instead, we look to the federal court precedent to resolve this issue. See L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ., 189 N.J. 381, 405 (2007) (noting that New Jersey courts "may look to federal jurisprudence for guidance").

Rule 4:22-2 "follows Fed. R. Civ. P. 36(b) and clarifies the extent to which a party is bound by his admission." Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 4:22-2 (2020) (emphasis added). In Kittrick v. GAF Corp., 125 F.R.D. 103, 106 (M.D. Pa. 1989), the District Court concluded that a plaintiff's admissions could not bind a third-party plaintiff. The court relied upon Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 2264 at 741 (1970) ("It is only when the admission is offered against the party who made it that it comes within the exception to the hearsay rule for admissions of a party opponent." (footnote omitted)); id. at 746-47 ("The admission does not bind the party who requested it. . . . Nor do the admissions of a party bind

a coparty." (footnote omitted)). See also Riberglass, Inc. v. Techni-Glass Indus., 811 F.2d 565, 566-67 (11th Cir. 1987); In re Leonetti, 28 B.R. 1003, 1009-10 (E.D. Pa. 1983), aff'd mem. sub nom. Earl Realty, Inc. v. Leonetti, 725 F.2d 667 (3d Cir. 1983) (admission of one party is not binding upon a co-defendant); United States v. Wheeler, 161 F. Supp. 193, 198 (W.D. Ark. 1958) (requests for admission directed only to one party are not binding on another party). We find these federal authorities persuasive.

Claremont's reliance on Massachusetts Mutual Life Insurance Co. v. Manzo, 234 N.J. Super. 266 (App. Div. 1989), rev'd on other grounds, 122 N.J. 104 (1991), is misplaced. In Manzo, the court found admissible a requested admission under Rule 4:22-2 where the party to whom the answer was directed failed to respond. 234 N.J. Super. at 281. Unlike in this case, the request was served on the very parties sought to be bound by their failure to respond. Here, in contrast, the requests for admission were served upon IUC not Eastern.

While the requests for admission may have been admissible against IUC, they are not admissible against Eastern, who did not make the admissions. It would be fundamentally unfair to bind Eastern to IUC's responses to requests for admissions. Eastern had the right to contest any material facts in dispute; that right is not lost because a defaulted party (IUC) admitted those facts. We

discern no abuse of discretion by the trial judge in excluding the requests for admission served upon IUC from evidence.[3]

BURDEN TO ASCERTAIN SOURCE OF FUNDS

Claremont argues Eastern has no valid lien claim because "it failed in its duty to ascertain where the payments they received were actually coming from in order to allocate the funds to the appropriate project," citing Craft.

In Craft, the Court held that "a supplier has a duty to determine which of a contractor's projects is the source of its payment and to allocate the payment accordingly." 179 N.J. at 63. The Court stated when "the creditor knows or should know that a debtor is under an obligation to a third party to devote a relevant payment to discharge a duty the debtor owes to the third party, the payment must be applied to do so regardless of the debtor's instruction or lack thereof." Id. at 74.

In L&W, we expanded on a supplier's obligation to determine the source of payments made by purchasers of materials and properly allocate the funds. We clarified that the standard established in Craft "imposes an affirmative duty

_____

[3] In any event, we view the alleged error as harmless. Charles Abate, Eastern's Chief Financial Officer, testified that he did not know or attempt to ascertain the source of the funds from which Eastern was paid.

13

upon the supplier to allocate payments correctly" and thus "the supplier must inquire about the source of payments it receives." L & W, 429 N.J. Super. at 190.  We noted, however, that an inquiry "would serve no purpose if the contractor has specifically instructed that its payments be allocated to particular accounts and the supplier has no reason to believe that the allocation is improper."  Ibid.  We explained:  "The law should not generally require a supplier to challenge a materials purchaser without reason to suspect improper allocation of funds.  To do so would impose on suppliers the burdensome and awkward duty of presuming that their customers may be engaging in improper conduct."  Id. at 190-91.  We held that it is only

> when [a] purchaser of materials has not provided specific, reliable instructions as to the allocation of its payment, or when the circumstances are such that a reasonable supplier should suspect the purchaser has not used an owner's funds to pay for materials supplied for that owner, [that] supplier must make further inquiry and attempt to ascertain the source of the payment funds so that it can allocate them to the correct accounts.
>
> [Id. at 192.]

Claremont maintains Eastern breached its duty to ascertain the source of the funds received from IUC and to allocate those funds to work relating to the Marin Project.  It contends IUC utilized a general operating account, where

14

Claremont's checks were deposited and from which IUC paid down its promissory note to Eastern. The trial judge rejected Claremont's argument, noting: there was no evidence that Claremont's checks were the only funds available in IUC's account; Eastern kept an accounting record indicating the IUC's funds were properly credited to work relating to the Marin Project; and IUC was not required to have a separate bank accounts for different jobs. We discern no error by the trial judge. The record supports her findings.

CLAREMONT'S CLOSING ARGUMENT

Claremont contends "the court erred in directing [it] not to mention collusion" during its summation. We disagree.

We recognize that "counsel is allowed broad latitude in summation." Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999) (citations omitted). "That latitude is not without its limits, and 'counsel's comments must be confined to the facts shown or reasonably suggested by the evidence introduced during the course of the trial.'" Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (quoting Colucci, 326 N.J. Super. at 177). "Further, counsel 'should not misstate the evidence nor distort the factual picture.'" Ibid. (quoting Colucci, 326 N.J. Super. at 177). "A trial court must exclude from summation those arguments that the evidence does not reasonably support." State v. Reddish, 181

N.J. 553, 629 (2004) (citation omitted). The scope of summation "must not exceed the 'four corners of the evidence,'" and "all reasonable inferences drawn therefrom." State v. Loftin, 146 N.J. 295, 347 (1996) (citations omitted).

"The trial court has broad discretion in the conduct of the trial, including the scope of counsel's summation." Litton Indus. v. IMO Indus., 200 N.J. 372, 392 (2009). "The abuse of discretion standard applies to the trial court's rulings [concerning] counsel's summation." Id. at 392-93.

As discussed above, Claremont sought to argue IUC improperly diverted funds from the Claremont-IUC subcontract to pay off its promissory note with Eastern for work unrelated to the Marin Project, and that Eastern turned a blind-eye. In directing Claremont not to mention collusion, the judge stated, "there's [not] enough evidence in the case . . . to permit [Claremont] to ask the jury to infer that [IUC] was diverting the funds." Based on her review of the record, the judge found the defense theory was speculative. Absent evidence of collusion, the judge properly precluded mention of collusion during defense counsel's summation. We discern no abuse of discretion.

AMOUNT OF THE LIEN FUND

Claremont contends the trial judge erred by failing to instruct the jury that the lien fund was limited to $552,500, and for "allowing the jury to consider

purported unsigned change orders" in determining the lien fund amount. Claremont asserts $552,500 (the five percent retainage) is the lien limit because that was the amount due on the Claremont-IUC subcontract, IUC certified it paid its suppliers, and no change orders were approved in accordance with the subcontract. We concur.

Statutory interpretation involves questions of law and is reviewed de novo by appellate courts. McGovern v. Rutgers, 211 N.J. 94, 108 (2012). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995). However, fact findings by a judge are entitled to deference on appeal "when supported by adequate, substantial and credible evidence" in the record. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974).

The lien fund is defined by N.J.S.A. 2A:44-2:

> "Lien fund" means the pool of money from which one or more lien claims may be paid. The amount of the lien fund shall not exceed the maximum amount for which an owner can be liable. The amount of the lien fund that attaches to the owner's interest in the real property cannot exceed the lien fund.

A-3492-18T1

In turn, N.J.S.A. 2A:44A-9 addresses the date that the lien fund is calculated. It states, in relevant part:

> If more than one lien claimant will participate in a lien fund, the lien fund shall be established as of the date of the first of the participating lien claims lodged for record unless the earned amount of the contract increases, in which case the lien fund shall be calculated from the date of the increase.
>
> [N.J.S.A. 2A:44A-9(f).]

Here, Eastern and EDC filed lien claims against the property and sought to participate in the lien fund. EDC filed the first lien claim in May 2017; at that time, the record indicates the only amount due to IUC from Claremont was the retainage amount, $552,500. The court submitted the computation of the lien claim to the jury. The jury interrogatories indicate the jury considered the retainage amount along with other separate amounts for work allegedly performed and unpaid. The jury ultimately found the lien fund consisted of the $552,500 retainage in addition to $155,279 for "completed and unpaid approved work and purchased materials."

Claremont argues the referenced change orders surfaced after May 2017 and are invalid because they were not executed in accordance with the subcontract. Therefore, it did not constitute "earned money" that would increase

the lien fund.[4]  We agree.  The trial court did not interpret the contract or change orders, leaving the issue for the jury to decide.  An improperly executed change order does not constitute "earned money" and should not have been considered by the jury in the computation of the lien fund.  N.J.S.A. 2A:44A-9(f).

Furthermore, the computation of the lien fund should have been undertaken by the court.  While N.J.S.A. 2A:44A-9 does not expressly state whether the determination of a lien fund is for the court or jury, N.J.S.A. 2A:44A-23, which addresses payment of lien claims, indicates the court should make such determination.  "The Superior Court shall order the distribution of a lien fund, after its calculation in accordance with [N.J.S.A. 2A:44A-9] . . . ."  N.J.S.A. 2A:44A-23(c).  "[S]tatutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole."  Burnett v. County of Bergen, 198 N.J. 408, 421 (2009) (quoting Bedford v. Riello, 195 N.J. 210, 224 (2008)).

As we explained in NRG, "[t]he court must also calculate the lien fund for each claimant."  454 N.J. Super. at 597.  While the value of the work and materials may be issues of fact, the "earned amount of the contract" is calculated by the court.  Id. at 597-98.

---

[4]  It is also unclear whether the work was, in fact, performed.

A-3492-18T1

The trial court erred by permitting the jury to determine the amount of the lien fund. The record establishes that the amount of the lien fund was $552,500, not $707,779. We reverse that aspect of the verdict and remand for the trial court to enter a corrected judgment fixing the lien fund at $552,500.

LIEN FUND PARTICIPATION

We next address whether Claremont was entitled to participate in the lien fund. Claremont argues the court erred in denying introduction of evidence of its claim against IUC and that it is entitled to be a first-tier lien fund participant.[5] Claremont contends it "need not file a lien" to participate in the lien fund "because as the owner of the bond it is an equitable lien holder." We are unpersuaded by this argument.

N.J.S.A. 2A:44A-3 addresses entitlement to a construction lien. It states, in relevant part:

> Any contractor, subcontractor or supplier who provides work, services, material or equipment pursuant to a contract, shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price, subject to [N.J.S.A. 2A:44A-6, -9 and -10].
>
> [N.J.S.A. 2A:44A-3(a).]

_____

[5] A first-tier claimant is "a claimant who is a contractor." N.J.S.A. 2A:44A-2.

N.J.S.A. 2A:44A-9(b)(1) states, subject to certain exceptions, "in the case of a first tier lien claimant, [the lien fund shall not exceed] the earned amount of the contract between the owner and the contractor minus any payments made prior to service of a copy of the lien claim."

Here, Claremont sought to introduce six "job work order" forms; the judge excluded the documents. The judge reasoned that the only witness who referenced those forms did not prepare the documents, did not have the "expertise or qualifications" to testify about the document, and "has nothing to do with the determination that back charges [are] warranted or should be pursued." Thus, to the extent Claremont argues the judge abused her discretion in excluding job work order forms, its argument lacks merit.

Moreover, the record does not suggest KRE owes Claremont any money under their contract so as to entitle Claremont to be a first-tier claimant in the lien fund. See N.J.S.A. 2A:44A-9(b)(1).

For these reasons, the judge properly determined that Claremont was not a lien fund participant.

PRO RATA v. PRO TANTO REDUCTION OF THE LIEN FUND

Finally, Claremont argues the court erred by treating its settlement with EDC as a pro tanto reduction in the lien fund. It contends the verdict "should

be molded according to the 10.8 percent that EDC had, and the judgment should be reduced pro rata and not pro tanto."  We disagree.

N.J.S.A. 2A:44A-23 addresses the payment of lien claims.  "The amount due a lien claimant shall be paid only after the lien claim has been established by judgment . . . .  All lien claims established by judgment are valid claims that shall be concurrent and shall be paid as provided in subsection c. of this section."  N.J.S.A. 2A:44A-23(a).  N.J.S.A. 2A:44A-23(c), in turn, states that "[t]he Superior Court shall order the distribution of a lien fund, after its calculation in accordance with [N.J.S.A. 2A:44A-9] . . . ."  It provides five manners in which to the funds may be allocated.  N.J.S.A. 2A:44A-23(c)(1)-(5).  While all five refer to pro rata allocation, this does not end our analysis.

Eastern's filed lien claim was for $784,661.40.  The jury found the lien fund was $708,277.84.  The court entered a judgment against Claremont in the amount of $658,277.84 after reducing the lien fund amount by the $50,000 settlement between Claremont and EDC.  The court determined reduction of the lien fund pro tanto was proper "because EDC settled their claim," and therefore EDC's "lien claim was not 'established by judgment' as referenced in N.J.S.A. 2A:44A-23(c)."  It also reasoned "there is no need to allocate on a pro rata basis

as set forth in N.J.S.A. 2A:44A-23(c)(5)[6]" "because the combined amount of the claims made does not exceed the amount of the lien fund established by the jury."

While the statute does not refer to pro tanto allocations, it states that "[t]he amount due a lien claimant shall be paid only after the lien claim has been established by judgment." N.J.S.A. 2A:44A-23(a). "All lien claims established by judgment are valid claims that shall be concurrent and shall be paid as provided in in subsection c. of this section." Ibid. Because EDC and Claremont settled their dispute, EDC's lien claim was not established by judgment. Therefore, the court was not authorized to allocate the funds pro rata pursuant to N.J.S.A. 2A:44A-23(c).

Since the lien fund was only $552,500, applying the $50,000 pro tanto rata allocation, Eastern shall be paid $502,500 on its lien. Accordingly, the trial

---

[6] N.J.S.A. 2A:44A-23(c)(5) provides:

> If there are no first or second tier lien claimants, the lien fund for third tier lien claimants shall be allocated in amounts equal to that third tier's valid claims. If the total of the claims of any group of third tier lien claimants exceeds the lien fund for that group of claimants as provided by [N.J.S.A. 2A:44A-9] the allocations shall be reduced pro rata so as not to exceed that lien fund.

court shall enter an amended judgment in favor of Eastern reflecting that amount.

In sum, we affirm the trial judge's rulings except we reverse the calculation of the amount of the lien fund. We remand for entry of an amended judgment fixing the lien fund at $552,500 and the amount of Eastern's lien at $502,500, after applying the $50,000 pro tanto reduction.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION