872 A.2d 142

LABOV MECHANICAL, INC., S.M. ELECTRIC CO., INC., AND FRANK LILL & SON, INC., PLAINTIFFS–RESPONDENTS, v. EAST COAST POWER, L.L.C., AND EAST COAST POWER LINDEN, GP, L.L.C., DEFENDANTS–APPELLANTS, AND AC & S, INC. (A/K/A NEW STATES CONTRACTING), FURINO & SONS, INC., NEPCAN ENGINEERING LTD., FOSTER WHEELER ENERGY CORPORATION, MECHANICAL DYNAMICS AND ANALYSIS, L.L.C., JOSEPH JINGOLI & SON, INC., SIMPLEX GRINNELL, L.P. (A/K/A GRINNELL FIRE PROTECTION), ONYX INDUSTRIAL SERVICES, INC., WEST VIRGINIA PAINT & TANK COMPANY, AMQUIP CORPORATION, EPIC PROCESS CONTROL AND SAFEWAY STEEL PRODUCTS, INC., DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted April 20, 2005—Decided May 5, 2005.

Before Judges CONLEY, BRAITHWAITE and WINKELSTEIN.

*Lindabury, McCormick & Estabrook,* attorneys for appellants (*Barry J. Donohue and Bruce P. Ogden,* on the brief).

*Peckar & Abramson,* attorneys for respondent Labov Mechanical, Inc., *Clancy, Callahan & Smith,* attorneys for respondent S.M. Electric Co., Inc., and *Brown & Moskowitz,* attorneys for respondent Frank Lill & Son, Inc. (*Charles F. Kenny, Edward M. Callahan, Jr., and Kenneth L. Moskowitz,* on the joint brief).

*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys for defendant Foster Wheeler Energy Corp. (*Robert S. Moskow, II,* on the brief).

*Steven A. Berkowitz & Associates,* attorneys for *amicus curiae* The South Jersey Mechanical Contractors Association (*Steven A. Berkowitz,* on the brief).

The opinion of the court is delivered by

CONLEY, P.J.A.D.

This is a Construction Lien Law (CLL), *N.J.S.A.* 2A:44A–1 to – 38, appeal. Respondents are subcontractors on a $96 million energy operation project.[1] Appellant East Coast Power (ECP) is

---

[1] Defendant Foster Wheeler, also a subcontractor on the job, has filed a brief as a respondent. However, the summary judgment that forms the basis for this

the owner of the project. Its general contractor, NEPCO, whose parent corporation was ENRON, ran into cash flow difficulties towards the end of the project and did not meet its contractual completion date.[2] ECP negotiated an amendment to the contract that, among other things, extended the final completion date and modified a liquidated damages clause to establish an agreed fixed liquidated damages amount. Critically, however, the amendment included, as to moneys then due to subcontractors from NEPCO and as to the assessment of the agreed upon liquidated damages against NEPCO, the following:

> Owner shall not assert any claims arising in connection with or as may be required to discharge mechanic's and materialmen's liens arising in connection with certain amounts due and owing as of the date hereof to Subcontractors for work performed prior to December 1, 2001 and otherwise shall not assert any claims arising under this Agreement against Contractor before the earlier of (i) April 30, 2002 and (ii) the date upon which Contractor shall commence a voluntary proceeding ... seeking liquidation, reorganization or other relief with respect to Contractor or its debts....

On November 29, 2001, respondent Labov Mechanical, Inc. (Labov) filed a construction lien claim against ECP in the amount of $6,663,917 for work, services, material and equipment provided by it to NEPCO pursuant to its subcontract with NEPCO. Similar liens were filed on December 6, 2001, and amended on February 28, 2002, by respondent S.M. Electric Co., Inc. (S.M.) in the amount of $2,828,081.67 and on February 13, 2002, by respondent Frank Lill & Son, Inc. (Frank Lill) for $2,231,151.16. When Labov filed its lien claim, approximately $11,000,000 remained unpaid on the Prime Contract. That amount did not change until February 2002 when, after the filing of respondent's lien claims, ECP advised respondents that only $8,185,755 was available for a lien fund. It claimed that under the December 1, 2001, amend-

---

appeal does not include Foster Wheeler. Technically, Foster Wheeler has no standing to participate in this appeal. Our decision on the legal issue presented in this appeal, however, applies as well to it.

[2] The original contractual completion date was October 26, 2001. ENRON filed for bankruptcy in December 2001. NEPCO filed for bankruptcy in May 2002.

ment to the contract with NEPCO it was entitled to $2,196,000 in liquidated damages from NEPCO which it could off-set from the contract price.

Respondents filed an action against ECP seeking a *pro rata* distribution of the full amount remaining due to NEPCO under the prime contract, *i.e.,* $11,000,000. Following partial settlement as to $8,185,755 that ECP agreed was distributable to the lien holders, and after completion of discovery, motions for summary judgments were filed by respondents as to the remaining $2,196,000. The motion judge granted summary judgment to respondents, rejecting ECP's efforts to reduce the lien fund by the amount of the contractual liquidated damages against NEPCO. We affirm that judgment for the reasons set forth by Judge Miriam Span in her well-reasoned, legally supported, September 15, 2003, written decision. We add the following.

 "The CLL is a lien statute which, consistent with the general protections afforded by such statutes, is remedial and 'designed to guarantee effective security to those who furnish labor or materials used to enhance the value of the property of others.'" *Triple "R" Enters., Inc. v. Pezotti,* 344 *N.J.Super.* 31, 37, 779 *A.2d* 1110 (App.Div.2001) (quoting *Thomas Group, Inc. v. Wharton Senior Citizen Hous., Inc.,* 163 *N.J.* 507, 517, 750 *A.2d* 743 (2000)). The CLL is to be read "sensibly" in accord with the policies sought to be served by it. *Craft v. Stevenson Lumber Yard, Inc.,* 179 *N.J.* 56, 68, 843 *A.2d* 1076 (2004). Those policies are, firstly, to help secure payment to those who provide work, services, material or equipment pursuant to a written contract, and, secondly, to protect the rights of property owners who have met their financial obligations under the contract so that they do not become responsible for double payment for work and materials. *Ibid.*

 To effectuate these policies, the CLL directs, in part:

Any contractor, subcontractor or supplier who provides work, services, material or equipment pursuant to a contract, shall be entitled to a lien for the value of the work or services performed, or materials or equipment furnished in accordance

with the contract and based upon the contract price, subject to the provisions of sections 9 and 10 of this act.

[*N.J.S.A.* 2A:44A-3.]

A "lien claim shall attach to the interest of the owner from and after the time of filing of the lien claim." *N.J.S.A.* 2C:44A-10. While the filing of a lien by one subcontractor does not establish a lien fund for a subsequent lien holder, *Triple "R" Enters., Inc. v. Pezotti, supra,* 344 *N.J.Super.* at 36–37, 779 *A.*2d 1110, it is undisputed that all respondents here filed their liens prior to ECP's efforts to effectuate the reduction of the lien fund by way of an offset of its contractual liquidated against NEPCO.[3]

At issue here, is the CLL's secondary policy to protect owners who have performed their financial obligations under a construction contract. In this respect, the CLL provides that "[t]he amount of a lien claim shall be limited to *the contract price, or any unpaid portion thereof,* whichever is less, of the claimant's contract for the work, services, material or equipment provided." *N.J.S.A.* 2A:44A-9 (emphasis added). "Contract price" is defined in the CLL as "the amount specified in a contract for the provision of work, services, material or equipment." *N.J.S.A.* 2A:44A-2. But that amount:

> shall not be greater than … a. In the case of a lien claim filed by a contractor, *the total amount of the contract price of the contract between the owner and the contractor less the amount of payments made, if any, prior to receipt of a copy of the lien claim pursuant to section 7 of this act …; or b. In the case of a lien claim filed by a subcontractor or supplier, the amount provided in subsection a. of*

---

[3] As to such offset, section 6.8 of the Prime Contract provides:

Notwithstanding anything herein to the contrary, upon prior notification to Contractor, Owner shall have a right to set-off against amounts payable by Owner to Contractor (a) any amount previously paid by Owner to Contractor which has been determined to have been not due under the terms of this Agreement, (b) any fine or penalty imposed by any Governmental Authority which is payable by Contractor, or which is assessed against Owner for any act or omission of Contractor, and which is paid by Owner on Contractor's behalf, (c) subject to the provisions of *Article 15* hereof, all costs (including reasonable attorneys' fees) incurred by Owner to discharge liens on the Facility, and (d) any other amounts due Owner and which have not been paid by Contractor in accordance with the terms of this Agreement.

*this section,* or the contract price of the contract between the contractor or subcontractor and the subcontractor or supplier, as applicable, pursuant to which the work, services, materials or equipment is provided by the subcontractor or supplier, less the amount of payments made, if any, prior to receipt of a copy of the lien claim pursuant to section 7[4] of this act. . . ."

[*N.J.S.A.* 2C:44A–10 (emphasis added).]

ECP contends that the unpaid contract price of $11,000,000 as of the filing of the liens must be reduced by the liquidated damages it was entitled to from NEPCO. In this respect, it asserts that, as of the original completion date, October 26, 2001, which NEPCO had not complied with, it could have offset the daily delay damages of $36,000 against the contract price. It did not then do so. But, as of December 1, 2001, with NEPCO's agreement to the new liquidated damages provision, ECP asserts that the contract price was automatically reduced by the agreed to amount, *i.e.,* $2,196,000.

Contrariwise, respondents argue that the lien fund was established upon filing of their lien claims, all prior to ECP's notification of its intent to reduce the contract price by assessment of the liquidated damages. They also point out that Section 17 of the December 1, 2001, amendment provided a new "Guaranteed Completion Date" of April 30, 2002, and prevented ECP from "assert[ing] any claims arising under this Agreement against Contractor before the earlier of (i) April 30, 2002 and (ii) the date upon which Contractor shall commence a voluntary proceeding . . . seeking liquidation, reorganization or other relief with respect to Contractor or its debts. . . ."

While declining to find April 30, 2002, the new "Guaranteed Completion Date," Judge Span nonetheless held that "an Owner cannot reduce the Lien Fund by contractual liquidated damages against the prime contractor *after* the Fund has been established, to the detriment of subcontractors who were not parties to the

---

4 Section 7 requires a claimant to serve a copy of the lien claim, either by mail or otherwise, upon the owner, or person "against whom the claim is asserted" within ten business days after the filing of the lien. *N.J.S.A.* 2A:44A–7. It is undisputed that plaintiffs satisfied the requirements of section 7.

Prime Contract." This result is entirely consistent with our decisions in *Legge Indus. v. Joseph Kushner Hebrew Academy,* 333 *N.J.Super.* 537, 756 *A.*2d 608 (App.Div.2000) (*Legge* ), and *AEG Holdings, L.L.C. v. Tri–Gem's Builders, Inc.,* 347 *N.J.Super.* 511, 790 *A.*2d 954 (App.Div.2002).

In *Legge,* a contractor defaulted in payment to its suppliers, who then brought action against the owner to enforce their construction liens against the landowner's property. The owner defended, in part claiming that because the contractor was unable to complete the job, he had incurred additional costs greater than the original contract price, "thereby using up the retainage withheld under the [prime contract]," 333 *N.J.Super.* at 542, 756 *A.*2d 608, and that "because no money was due and owing to [the contractor] no lien fund existed pursuant to *N.J.S.A.* 2A:44A–10...." *Ibid.* We reversed the summary judgment granted the owner. We recognized that: "Underlying the lien fund concept is the principle that an owner ... should not be compelled to pay twice for the same work or services when a valid lien claim is filed." *Id.* at 548, 756 *A.*2d 608 (quoting *Thomas Group, Inc. v. Wharton Senior Citizen Hous., Inc., supra,* 163 *N.J.* at 521, 750 *A.*2d 743). Thus, a property owner, under the CLL, should never be subject to liens in an amount greater than the amount unpaid by the owner to its prime contractor at the time the lien claim is filed. But we balanced that principle against the suppliers' "interest in being paid for materials already delivered and the owner's interest in paying only once for the same job." *Id.* at 554, 756 *A.*2d 608. Thus, the "question boils down to which of two innocent parties, the owner or the supplier, should bear the risk of loss." *Id.* at 556, 756 *A.*2d 608. We imposed that risk upon the owner in light of the polices to be served by the CLL and its remedial nature, observing:

[A]s a matter of equity, if there has been a default by the prime contractor after delivery of the supplier's goods, a covering contractor's price to complete the project should reflect the materials already on hand. Thus the owner's actual risk of double payment is likely to be minimized under the priority rule we announce,

whereas a contrary rule, denying the supplier's priority in the retainage, is likely to assure the supplier's loss.

[*Ibid.*][5]

We reached a similar result in *AEG Holdings, L.L.C. v. Tri-Gem's Builders, Inc., supra,* 347 *N.J.Super.* at 515, 790 *A.2d* 954. There a contractor filed for bankruptcy and defaulted in payment to a subcontractor prior to completion of the project. As a result, the subcontractor filed a construction lien against the owner and brought an action for enforcement of the lien. It was undisputed that the subcontractor was owed the amount of the lien for work it had performed. The owner argued, however, that because the contractor stopped work before significant completion of the project, the owner "will have to pay additional sums to others to have the job finished," thereby using up the retainage. *Id.* at 513, 790 *A.2d* 954. We concluded that was a risk which must be borne by the owner and not an innocent subcontractor. *Id.* at 515, 790 *A.2d* 954.

We pause here to note that in its main brief, ECP attempts to cast respondents as responsible for the delay. But there is no factual support for that in the motion record. What is more, ECP has never contested the lien claims as it could have pursuant to *N.J.S.A.* 2A:44A–12. Indeed, NEPCO has taken the position that no delays are attributable to respondents.[6] This is, then, simply a question of balancing the loss of payment for the respondents' performance on the job against the loss of ECP's ability to easily facilitate its right to liquidated damages from NEPCO by way of

---

[5] We also held in *Legge* that a lien fund cannot be reduced by payments made by the owner that were not earned and due at the time the notice of a lien claim was filed. *Id.* at 547, 756 *A.2d* 608. There is no issue here as to overpayments.

[6] NEPCO did, however, pursue arbitration on Foster Wheeler's lien claim. We assume the result of that arbitration was the basis of the trial judge's order of February 20, 2004, which reduces Foster Wheeler's lien claim, but "not the actual distribution to Foster Wheeler," by $521,476. As we understand the orders that were filed subsequent to the summary judgment order on appeal, Foster Wheeler is entitled to share in the lien fund on an equal *pro rata* basis.

offsetting that amount against the unpaid contract price. It was in this context that Judge Span asked, rhetorically:

> If, after the default of the prime contractor, the lien claimant has a superior right to the retainage to the owner's right to use it to get the job completed, why would an owner have a greater right to liquidated (or other) delay damages, which are very much like retainage to ensure a job is finished on time and according to contract specifications?

We agree with her answer that, under the circumstances, the owner has no such greater right to its liquidated damages claim.

We add the following in light of ECP's reliance upon *Craft v. Stevenson Lumber Yard, Inc., supra,* 179 *N.J.* 56, 843 *A.*2d 1076, decided after the motion judge's determination. *Craft* involved two issues. First, whether an "innocent property owner is liable to a supplier when the owner has paid his general contractor for supplies, which payments were transferred to the supplier without being earmarked, and were not recognized by the supplier as satisfying that property owner's account balance." *Id.* at 63, 843 *A.*2d 1076. The Court answered this in the negative. This issue, and the Court's analysis, is not relevant to the issue here.

The second issue in *Craft* was "the measure of the amount [of a lien fund] that is available to a subcontractor or supplier with a lien claim when the contractor has abandoned the job at a point at which the property owner has made all of the progress payments to date." *Ibid.* It is the Court's discussion of this issue which ECP claims is dispositive.

To be sure, there are portions of *Craft* which would seem to support ECP. To begin with, the contract price in *Craft* was $220,000. That was the amount, less payments thereon, the lien claimants sought to use as the lien fund. In allowing the owner to utilize the lower amount of $166,980 which had been paid for work done at the time the contractor left the job, the Court noted:

> For the purposes of the motion for summary judgment on the lien claim, all parties agreed that although [the contractor] and Craft did not alter their contract price in writing, that [the contractor] was fully paid for the work it performed, that it refused to perform further work, and that Craft thus owed it nothing. To us, that is the heart of the matter. *Because the lien fund can only be based on what is actually owed, when nothing is owed there can be no fund.*

[*Id.* at 80, 843 *A.*2d 1076 (emphasis added).]

Thus, the Court concluded:

> So directed, we hold when a contractor walks off a job at a point at which he has been paid to date and is owed no money by the owner, there is no lien. [*Id.* at 81, 843 *A.*2d 1076.]

Quite simply, that is not the case here. All of the parties to the project remained on the job and performed. Because, however, of NEPCO's financial difficulties, respondent subcontractors were not fully paid. But they remained, as did NEPCO, and the job was completed, albeit three months late. The issue, then, unlike in *Craft,* is whether the subcontractors or the owner bears the loss of the delay. ECP seeks to impose the loss upon respondents by way of a contractual provision agreed to only by ECP and NEPCO, allowing a depletion of the contract price, *i.e.,* the lien fund. But what the Court said in *Craft* would countenance a contrary result:

> Not every payment to a contractor will concomitantly reduce the size of a property owner's lien fund. As the court in *Legge Industries v. Joseph Kushner Hebrew Academy,* 333 *N.J.Super.* 537, 549 [756 *A.*2d 608] (App.Div.2000), observed, there is no evidence that the Legislature intended to permit a property owner to defeat a supplier's lien claim by knowingly or negligently advancing payments to the contractor that are not due. Among the payments that will not qualify as reductions from the total contract price for a lien fund calculation are payments in violation of the contract provisions or other collusive payments *and retainages, even when an owner is required to spend further money to complete construction. Legge Indus., supra,* 333 *N.J.Super.* at 557 [756 *A.*2d 608] (holding that "lien fund" includes contractual retainage); *see also AEG Holdings, L.L.C. v. Tri–Gem's Builders, Inc.,* 347 *N.J.Super.* 511, 515 [790 *A.*2d 954] (App.Div.2002) (recognizing that "a property owner's maximum liability is not reduced by payments made to the contractor that were not earned and due before the subcontractor's lien was filed"). *Only legitimate payments in accordance with the written contract and commensurate with performed work are considered as deductions from the total contract price. All other payments must be recaptured in determining the limit of the lien fund. See generally Legge Indus., supra. In so ruling, courts have carried out the intent of the Legislature to benefit contractors, subcontractors, and suppliers who furnish labor and materials by guaranteeing that the available lien fund is not improperly reduced or otherwise circumscribed.*
> [*Id.* at 68–70, 843 *A.*2d 1076 (emphasis added).]

The liquidated damages here was not "a legitimate payment" by ECP to NEPCO. It was, regardless of its effective date, similar

to the retainage in *Legge*, which we declined to deduct from the lien fund, a result the Supreme Court clearly agreed with in *Craft.*

We acknowledge that under the repealed Mechanics Lien Law, replaced by the CLL, an owner might have been able to reduce lien funds by the amount of delay damages it was entitled to from the prime contractor. *Reeve v. Elmendorf,* 38 *N.J.L.* 125, 130–31 (Sup.Ct.1875). But as we noted in *Legge*, "it is plain that the limited, secondary status of the stop notice claimant was intentionally eliminated by the new Lien Law...." 333 *N.J.Super.* at 556, 756 *A.*2d 608. Thus, we rejected the owner's reliance on *International Tel. & Tel. Corp. v. Envirco Servs., Inc.,* 144 *N.J.Super.* 31, 38, 364 *A.*2d 549 (App.Div.1976), which had held under the old Mechanics Lien Law that the claim of an owner who expends money to complete a job following default by the contractor is superior to that of a stop-notice claimant. We explained:

> The long-standing rule that the owner has priority over the stop-notice claimant has its rationale in the premise that "a stop notice operates as an assignment Pro Tanto of the money due the contractor .... [and the] rights of the stop notice claimant therefore can rise no higher than the rights of the general contractor, unless the owner has acted in violation of his duty [under] *N.J.S.A.* 2A:44–85 [not to pay the contractor in advance or for the purpose of defeating a lien]." *ITT,* 144 *N.J.Super.* at 37, 364 *A.*2d 549. *See also Brown v. Home Devel. Co.,* 129 *N.J. Eq.* 172, 175, 18 *A.*2d 742 (Ch.1941); *Anderson v. Huff,* 49 *N.J. Eq.* 349, 354, 23 *A.* 654 (Ch. 1892); *Reeve v. Elmendorf,* 38 *N.J.L.* 125, 127 (Sup.Ct.1875). A stop notice claimant under the Mechanics' Lien Law by definition held a far less favorable position than a lien claimant. *See A.C. Constr. Co., Inc. v. Kehoe,* 260 *N.J.Super.* 58, 61–62, 615 *A.*2d 271 (App.Div.1992). We have found no case holding that a lien claimant has such limited protection.
>
> [*Id.* at 556–57, 756 *A.*2d 608.]

We reach the same conclusion as to the liquidated damages claim ECP has against NEPCO.

Affirmed.