57 A.3d 558

L & W SUPPLY CORPORATION D/B/A BUILDING SPECIALTIES, PLAINTIFF–RESPONDENT, v. JOE DESILVA T/D/B/A DESILVA CONTRACTORS, DETAIL CONTRACTORS, INC., DESILVA DRYWALL, INC. AND ALL OTHER TRADE NAMES AND RELATED AND SUCCESSOR ENTITIES, JOE DESILVA, DEFENDANTS, AND PATOCK CONSTRUCTION CO., INC., EXTENDED MEDICAL CARE CORP., MERIDIAN HEALTH/MERIDIAN NURSING & REHABILITATION, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Submitted September 20, 2012—Decided December 19, 2012.

180

Before Judges FUENTES, GRALL and ASHRAFI.

*Martin J. Arbus,* attorney for appellants (*Leonard S. Needle,* on the briefs).

*Miller Law Offices, P.C.,* attorneys for respondent (*Larry L. Miller,* on the brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

This appeal requires our application of the Construction Lien Law, *N.J.S.A.* 2A:44A–1 to –38, where a subcontractor became insolvent and did not pay for all the materials it purchased for a building project. The Supreme Court held in *Craft v. Stevenson Lumber Yard, Inc.,* 179 *N.J.* 56, 63, 843 *A.*2d 1076 (2004), that a materials supplier that seeks to file a construction lien has a duty

to apply payments correctly against several open accounts of a materials purchaser, such as a subcontractor, if the supplier has reason to know that the payment funds came from a particular building project. We now consider the obligation of the materials supplier "to ascertain the source of ... payments and to apply them accordingly." *Id.* at 76, 843 *A.*2d 1076.

Plaintiff L & W Supply Corporation sold building materials on credit to a now-bankrupt subcontractor, Detail Contractors, Inc. When Detail failed to pay the full balance due for the materials, L & W filed a construction lien against the project for which the materials were supplied. Defendant Patock Construction Co., Inc. was the prime or general contractor for the project; defendant Extended Medical Care Corp./Meridian Health/Meridian Nursing & Rehabilitation ("Meridian") was the owner of the property and of the construction project; and defendant Travelers Casualty and Surety Company of America was the surety. Defendants now appeal from summary judgment entered in favor of L & W on its lien claim. We reverse and remand for trial as to defendants Patock and Travelers, and we reverse the judgment outright as to defendant Meridian.

## I.

### A.

The Construction Lien Law allows a contractor or supplier who is owed payment for its work or materials to file a lien against the real property on which the improvements are constructed. *N.J.S.A.* 2A:44A–3a. The primary purpose of this law is to secure payment of monies due to contractors and suppliers of a construction project. *Thomas Grp., Inc. v. Wharton Senior Citizen Hous., Inc.,* 163 *N.J.* 507, 517, 750 *A.*2d 743 (2000).

A secondary purpose is to "protect owners" against paying more than once for the same work or materials. *Labov Mech., Inc. v. E. Coast Power, L.L.C.,* 377 *N.J.Super.* 240, 245, 872 *A.*2d 142 (App.Div.2005). To effect the second purpose, the statute

limits the lien to the amount available in the "lien fund," which "shall not exceed the unpaid portion of the contract price of the claimant's contract for the work, services, material or equipment provided." *N.J.S.A.* 2A:44A–9a.

In the case of a supplier, the lien fund is defined as the lesser of (1) the amount of the prime contract price earned minus amounts already paid by the owner to the prime contractor, or (2) the amount the subcontractor has earned on the subcontract price minus amounts already paid by the prime contractor to the subcontractor. *N.J.S.A.* 2A:44A–9b(2).

When a lien claim is filed, the owner or prime contractor may pay the amount of a valid claim directly to the claimant and credit that payment against the subcontract price. *N.J.S.A.* 2A:44A–12. Alternatively, the owner or prime contractor may post a surety bond for 110% of the lien amount and release the owner's property from the claim. *N.J.S.A.* 2A:44A–31a, –32.

### B.

In this case, L & W filed a construction lien in July 2006 and, several months later, filed a complaint against defendants to collect on its lien claim.[1] L & W alleged it had supplied materials ordered by Detail for Meridian's construction project but that Detail had not paid all amounts due for those materials. After defendants answered the complaint, the litigation was delayed because of Detail's bankruptcy case. Eventually, the remaining parties filed cross-motions for summary judgment. Viewed most favorably to the non-prevailing parties, that is, defendants, *see R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), the summary judgment record revealed the following facts.

---

[1] At the time L & W's complaint was filed, the Construction Lien Law required that the lien claimant join as defendants the prime contractor and the subcontractor involved in its claim. *N.J.S.A.* 2A:44A–16. That statutory provision was repealed by *L.* 2010, *c.* 119, § 25, effective January 5, 2011.

In December 2003, Meridian entered into a contract with Patock as the general contractor to build an assisted living facility in Wall Township ("the Meridian project"). Patock, in turn, subcontracted with Detail to perform the metal stud, drywall, and carpentry work for the Meridian project. Detail was one of several entities owned and operated by defendant Joe DeSilva. In November 2005, Patock and Detail executed a subcontract priced at $1.2 million. Change orders eventually raised Detail's subcontract price to approximately $1.375 million.

L & W is a supplier of drywall, studs, and related materials. In 2003, L & W opened an account for Joe DeSilva to obtain materials on credit for his several business entities engaged in construction work. During 2006, DeSilva had open accounts with L & W for building projects other than the Meridian project. Through July 2006, L & W sold on credit to DeSilva materials for the Meridian project priced at $231,794.34.

From February 16 to July 10, 2006, Patock paid Detail $891,159.66 for the Meridian subcontract based on monthly requisitions from Detail, which included the costs of the materials supplied by L & W. In June 2006, Patock paid an additional $53,202.74 on behalf of Detail for past due fringe benefits owed to the carpenters' union. Thus the payments from Patock to or on behalf of Detail as of July 2006 totaled $944,362.40.

During the same time period, Detail paid $207,000 to L & W and another DeSilva entity paid $10,000 to L & W. Of the total $217,000 it received, L & W credited $103,959.45 to the Meridian project and the remaining $113,040.55 to other DeSilva accounts. L & W's accounting left a balance of $127,834.89 unpaid for materials it had delivered to the Meridian project. On July 26, 2006, L & W filed a construction lien in the last-stated amount against the Meridian project.

At the time the construction lien was filed, the lien fund—that is, the difference in the amount Patock owed on the subcontract and the amount it had paid Detail—was $380,407.60 (calculated as the adjusted subcontract price of $1,374,770.00 minus $944,362.40

paid by Patock to Detail). Thus, the amount of the lien fund was substantially more than L & W's lien claim of $127,834.89.[2]

After receiving notice of the lien claim, Patock, as principal, and Travelers, as surety, posted a construction lien bond, *see N.J.S.A.* 2A:44A–31a, thus discharging Meridian's property from the lien, *see N.J.S.A.* 2A:44A–32. In November 2006, L & W commenced this action against all three defendants, as well as against Joe DeSilva and DeSilva's business entities.

On October 4, 2010, the trial court granted summary judgment against Patock and Meridian for the full amount of L & W's claim. Patock filed a motion for reconsideration, which the trial court denied on January 21, 2011. L & W filed a motion for pre-judgment interest to be added to its claim, which the court granted. On January 21, 2011, the trial court entered judgment against Travelers for the $127,834.89 lien claim, and judgment against Patock and Meridian for $158,373.42, which amount is the lien claim plus pre-judgment interest.

## II.

### A.

In *Craft, supra,* 179 *N.J.* at 76, 843 *A.*2d 1076, the Supreme Court held that a lien claimant has a "statutory duty to allocate [the materials purchaser's] payments to the accounts from which they were derived." That is, where a subcontractor obtains payment from a general contractor for a specific job and then

---

[2] In their reply brief on appeal, defendants contend for the first time that the lien fund was less than the amount due to L & W. We will not consider that contention. Not only is it improper to make an argument for the first time in a reply brief, *Goldsmith v. Camden Cnty. Surrogate's Office,* 408 *N.J.Super.* 376, 387, 975 *A.*2d 459 (App.Div.), *certif. denied,* 200 *N.J.* 502, 983 *A.*2d 1110 (2009), but defendants conceded at oral argument in the trial court that the lien fund exceeded the lien claim on the date it was filed. Defendants may not change their position on appeal.

turns that money over to a supplier, the supplier must apply the money to the same job.

Defendants contend that the amount L & W is owed for materials supplied to the Meridian project is about $12,143.05, far lower than the $127,834.89 shown by L & W's accounts receivable reports.[3] They argue that L & W had a duty to apply to DeSilva's Meridian account other payments Detail and DeSilva made, namely, the balance of the total $217,000 paid during the relevant time period. Defendants argue that they demonstrated the existence of a genuine issue of material fact as to whether L & W properly discharged its duty to apply payments from the property owner and prime contractor to materials supplied for the owner's project. The trial court rejected those arguments and agreed with L & W's assertion that it applied payments correctly.

Having conducted our own examination of the summary judgment record, without deference to the trial court's conclusion, *see W.J.A. v. D.A.*, 210 *N.J.* 229, 237–38, 43 *A.*3d 1148 (2012), we agree with defendants that disputed material facts precluded entry of summary judgment in favor of L & W.

L & W submitted certifications from its regional credit manager, its supply yard manager, and Joe DeSilva, all stating that L & W had properly applied payments from DeSilva entities to the Meridian project and to other DeSilva accounts. An opposing certification and report of Patock's long-time bookkeeper disputed those assertions and the accuracy of L & W's accounting. The trial court focused on the amount of the lien fund as compared to the lien claim and accepted at face value the certifications in support of L & W's claims to establish that comparison. In doing so, the court did not adequately consider whether a dispute was shown concerning the accuracy of L & W's accounting.

---

[3] Defendants did not challenge directly the figures contained in L & W's accounts receivable reports, except that they alleged L & W had improperly included sales tax of $2,651.29. L & W responded that sales tax was later deleted from its invoices and is not included in its lien claim.

The certifications of L & W's witnesses did not explain how they determined that payments would be allocated among separate DeSilva projects. Without a showing of what affirmative steps L & W took to assure that it was applying DeSilva's payments to the appropriate projects, the bare conclusory assertions of its witnesses were not sufficient to eliminate disputed issues of fact as to the correctness of its accounting.

In reaching that conclusion, we must consider the primary legal issue in this appeal, namely, the lengths to which a supplier must go to discharge its *Craft* duty to allocate payments accurately. *Craft* involved facts similar to this case. The owner, Craft, hired a contractor to build a house. *Craft, supra,* 179 *N.J.* at 64, 843 *A.*2d 1076. The contractor obtained materials from a supplier, with whom it had several open accounts. *Ibid.* When the contractor made payments to the supplier, it did not direct to which accounts the payments should be applied, and the supplier applied them to the contractor's oldest debts. *Ibid.* Eventually, the contractor stopped working on Craft's project and filed for bankruptcy. *Ibid.* When the supplier sought to enforce a construction lien against Craft's property, Craft objected and argued that the supplier had forfeited its lien claim because it failed to apply payments derived from him to his project.

The Supreme Court first recognized the general rule that, without instructions to the contrary, a creditor may apply payments from a debtor in any manner it chooses. *Craft, supra,* 179 *N.J.* at 72, 843 *A.*2d 1076. However, based upon common law principles, the Court also held that: "When, as here, *the creditor knows or should know that a debtor is under an obligation to a third party* to devote a relevant payment to discharge a duty the debtor owes to the third party, the payment must be applied to do so regardless of the debtor's instruction or lack thereof." *Id.* at 74, 843 *A.*2d 1076 (emphasis added).[4]

_____

[4] *Restatement (Second) of Contracts* § 258(2) (1981), which the Court cited approvingly in *Craft, supra,* 179 *N.J.* at 74, 843 *A.*2d 1076, provides: "If the

■ Thus, *Craft* requires a supplier to allocate payments to the projects from which they were derived, if the supplier "knows or should know" the source of the payment. *Ibid.* The condition that the supplier knew or should have known the source of the payment serves the primary purpose of the Construction Lien Law to secure payment for contractors and suppliers. *Thomas Grp., supra,* 163 *N.J.* at 517, 750 *A.*2d 743 (quoting *J. R. Christ Constr. Co., Inc. v. Willete Assocs.,* 47 *N.J.* 473, 477, 221 *A.*2d 538 (1966)). Accordingly, we have held that, in a dispute between an owner and a blameless supplier or contractor, the latter's rights typically prevail. *See Labov Mech., supra,* 377 *N.J.Super.* at 250–51, 872 *A.*2d 142 (the owner's right to receive liquidated damages payments from the contractor did not reduce the lien fund); *AEG Holdings, L.L.C. v. Tri–Gem's Builders, Inc.,* 347 *N.J.Super.* 511, 515, 790 *A.*2d 954 (App.Div.2002) (lien claimant was entitled to be paid from the lien fund despite the fact that the owner would have to pay another contractor to do the work and would ultimately pay more than the contract price); *Legge Indus. v. Joseph Kushner Hebrew Acad.,* 333 *N.J.Super.* 537, 558, 756 *A.*2d 608 (App.Div. 2000) (owner's use of retainage to pay a successor contractor does not reduce the lien fund).

In *Craft,* the Supreme Court stated that the supplier "knew or had reason to know that it was not free to apply [the debtor's] payments at will." *Id.* at 75, 843 *A.*2d 1076. Also, in *Hiller & Skoglund, Inc. v. Atl. Creosoting Co.,* 40 *N.J.* 6, 190 *A.*2d 380 (1963), on which the Craft Court relied, the supplier "knew that the $15,000 [the subcontractor paid the supplier] was paid from funds received from" the general contractor. *Id.* at 24–25, 190 *A.*2d 380. But in neither case did the Court explain what constitutes a reason to know. We now consider the circumstances that give a supplier "reason to know."

---

obligor is under a duty to a third person to devote a performance to the discharge of a particular duty that the obligor owes to the obligee and the obligee knows or has reason to know this, the obligor's performance is applied to that duty."

■ Because *Craft, supra*, 179 *N.J.* at 75–76, 843 *A.*2d 1076, imposes an affirmative duty upon the supplier to allocate payments correctly, the supplier must inquire about the source of payments it receives. A failure to do so may warrant a finding that the supplier should have known the source of the payment.

In some other jurisdictions, a duty of inquiry has been rejected as placing too heavy a burden on the supplier. Applying Georgia law, for example, the Fifth Circuit stated that such a duty is an improper attempt to "convert a rule requiring action on the part of the creditor when he 'knows or should have known' into a duty on the part of the creditor to make inquiry." *Trans–Am. Steel Corp. v. J. Rich Steers, Inc.*, 670 *F.*2d 558, 564 (5th Cir.1982); *see also Geneva Pipe Co. v. S & H Ins. Co.*, 714 *P.*2d 648, 651 (Utah 1986) (suppliers cannot, consistently with business proprieties, inquire into the sources of money paid to them); *but see Sioux City Foundry & Mfg. Co. v. Merten*, 174 *Iowa* 332, 156 *N.W.* 367, 372 (Iowa 1916) ("it is incumbent upon the materialman to keep separate accounts, and to find out from the contractor on what contract the money is paid"). *Hiller* itself suggests that a duty to inquire is a bridge too far. *Hiller, supra*, 40 *N.J.* at 23, 190 *A.*2d 380 ("We do not suggest that a party below the direct payee of the prime contractor has a duty to inquire or that he is bound even where he has no knowledge, but reason to know and circumstantial information may be as effective as that which is direct.").

■ The passive duty imposed upon the supplier by the courts cited above is not reconcilable with the affirmative language in *Craft* that the supplier is "obligated to ascertain the source" of the subcontractor's payments and apply them accordingly. *Craft, supra*, 179 *N.J.* at 76, 843 *A.*2d 1076. To "ascertain" the source of funds, a supplier must take some action, and an inquiry about the source of the funds is the most obvious action to take.

An inquiry, however, would serve no purpose if the contractor has specifically instructed that its payments be allocated to particular accounts and the supplier has no reason to believe that the allocation is improper. The law should not generally require a

supplier to challenge a materials purchaser without reason to suspect improper allocation of funds. To do so would impose on suppliers the burdensome and awkward duty of presuming that their customers may be engaging in improper conduct. As the Court stated in *Hiller, supra,* 40 *N.J.* at 24, 190 *A.*2d 380, the "law ought to be based on people, especially those regularly engaged in business, doing the proper and conscionable thing."

■ On the other hand, if the supplier has reason to suspect that something is amiss in the material purchaser's allocation of payments to different accounts, then *Craft* requires that the supplier inquire further and verify the source of the payment funds. For example, if the materials purchaser seems to be using funds from one project to pay old debts on other projects, the supplier should take further action to apply the payments correctly, such as by questioning the purchaser about the source of the payments or contacting prime contractors or owners of projects to which it delivered materials. We do not imply that the supplier must always initiate an independent investigation of the source of payments, but *Craft* requires that the supplier not turn a blind eye to improper allocation of payments.

■ We emphasize that the duty imposed by *Craft* does not affect the supplier's right to collect all balances due from the person or entity that purchased the materials, or from any other party contractually obligated to pay for the materials. *Craft, supra,* 179 *N.J.* at 76–77, 843 *A.*2d 1076. Here, for example, L & W obtained a default judgment against Detail and DeSilva before the bankruptcy filing. The supplier's failure to take affirmative action to ascertain the source of funds affects only its right to encumber the real property of the owner. *Craft* holds that the supplier may benefit from the Construction Lien Law and file a lien against the property only if it has earlier taken steps to protect the property owner's right to proper allocation of the owner's payments. *Id.* at 75–76, 843 *A.*2d 1076.

■ In sum, we hold that, when the purchaser of materials has not provided specific, reliable instructions as to the allocation of its payment, or when the circumstances are such that a reasonable supplier should suspect the purchaser has not used an owner's funds to pay for materials supplied for that owner, then the supplier must make further inquiry and attempt to ascertain the source of the payment funds so that it can allocate them to the correct accounts. A supplier that fails to fulfill this duty sacrifices its rights under the Construction Lien Law. This reading of *Craft* is consistent with the Court's holding that a supplier "has a duty to determine which of a contractor's projects is the source of its payment and to allocate the payment accordingly." *Craft, supra,* 179 *N.J.* at 63, 843 *A.*2d 1076.[5]

■ In this case, the trial court found that L & W had discharged its duty to allocate Detail's payments accurately. The court stated: "Apparently the bank records from the DeSilva entities establish that no funds from Patock were used to pay invoices from the other projects. All monies received from the DeSilva entities from Patock payments appear to have been applied to the project." L & W's witnesses asserted so in their certifications, but they did not provide calculations or other details to show how they arrived at their conclusions.

Viewing the summary judgment record most favorably to defendants, that is, crediting the certification and accounting of Patock's bookkeeper and viewing reasonable inferences against the L & W witnesses, Detail paid L & W $113,040.55 that was applied to non-Meridian projects. No specific evidence in the record indicates whether DeSilva directed that amount to be allocated to his other projects, and whether L & W had or did not have reason to suspect that DeSilva and his business entities may be misapplying payments to past-due accounts. The conclusory certifications of L

---

[5] We do not suggest that the supplier's failure to comply with the duty imposed by *Craft* creates a right of action by an owner, prime contractor, or surety against the supplier.

& W's witnesses do not resolve the factual dispute as to whether L & W "ascertain[ed] the source" of the funds from which Detail and DeSilva were making payments. Defendants should have the opportunity to prove at a trial that L & W failed to make any inquiry about the source of the funds, or that it had reason to suspect that the DeSilva entities were not properly allocating their payments.[6]

Summary judgment should not have been granted on L & W's lien claim.

## B.

Meridian, as owner of the property, also challenges entry of judgment against it because a surety bond was filed that discharged its liability under the Construction Lien Law.

A surety bond equal to 110% of the amount claimed discharges the lien claim of record, and the owner's property is released from the lien. *N.J.S.A.* 2A:44A–31a, –32, –33a(1). Assuming there are no other claims made against the owner of the property, the "court shall ... order that the owner ... no longer be a party to an action to enforce the lien claim, and the surety issuing the bond shall be added as a necessary party." *N.J.S.A.* 2A:44A–33d.

In this case, because a surety bond had already been posted, and Travelers as surety was a named defendant, Meridian was not a proper defendant on the lien claim. The entry of judgment against Meridian on that claim was error. After summary judgment was entered on the lien claim, L & W dismissed all other counts of its complaint. Meridian should have been dismissed from the case with prejudice.

---

6 Patock also points to transfers of Patock monies between Detail and another DeSilva entity, DeSilva Drywall, Inc. According to Patock, these transfers "enabled DeSilva Drywall to make payments to L & W from Patock's monies to credit against non-Meridian related invoices." We are not able to assess the merits of this argument, but it points to facts in dispute that may be appropriate for resolution at trial.

### III.

We reverse and direct that the trial court dismiss with prejudice the complaint against Meridian. We remand for trial on L & W's lien claim against Patock and Travelers. We do not retain jurisdiction.