OSTRER, J.A.D.
*907 *582 These related appeals, consolidated for our opinion, raise a novel issue under the Construction Lien Law (CLL), N.J.S.A. 2A:44A-1 to -38, pertaining to the demolition, not the construction, of a structure. In particular, we must decide whether the value of salvage recovered by the demolition contractor enlarges the lien fund available to unpaid subcontractors who file lien claims.
The contract at issue did not require the property owner to pay a fixed price to the prime contractor for the demolition. Instead, the contractor paid the owner for the right to demolish the building and to salvage materials. We conclude the ultimate market value of the salvage materials, transferred to the contractor in return for its demolition work, constitutes an element of the "contract price," N.J.S.A. 2A:44A-2, and enhances the size of the "lien fund" available to lien claimants, N.J.S.A. 2A:44A-9. However, the net value of the fund is reduced by the contractor's cash payment to the owner. We also hold that the CLL requires a signatory of a corporation's lien claim to demonstrate he or she is a corporate officer pursuant to the corporation's bylaws or board resolution.
*583 We therefore modify the trial court order that the lien fund here consisted of the value of the salvage ultimately retrieved from the demolition site; and reverse the order that an employee of one of the lien claimants informally designated a "financial director" had sufficient authority to file a lien claim on behalf of his employer. We also affirm the trial court's denial of attorney's fees to one of the lien claimants.
I.
The litigation arises out of the demolition of a power generating station in South Amboy known as the Werner Generating Station. NRG REMA, LLC (NRG) is the property owner.
NRG sought bids from firms willing to undertake the demolition project. Some bidders wanted NRG to pay them from $400,000 to $6.6 million to demolish the generating station. Six others were willing to pay for the right to demolish the structure, offering $250,000 to $1.4 million. Those bidders counted on profiting from the resale of salvaged metals and equipment. But that upside was fraught with risk. It was difficult to estimate the *908 amount of such material, and the ease of extracting it. NRG made no promises on that score.
NRG selected Werner Deconstruction, LLC (Werner), which agreed to pay NRG $250,000 and to demolish the generating station, in return for the salvage. NRG claims it rejected more remunerative bids than Werner's because of its demonstrated capacity to finish the job on time. According to their contract, title to "Salvage Materials"-defined as "equipment, parts, components and materials ... to be salvaged during demolition, excavation or other operations"-vested in Werner when it paid NRG, which it evidently did on May 10, 2012.[1] If NRG terminated the contract for cause, title to all Salvage Materials remaining on site would revert to NRG. NRG also retained a security interest in the *584 Salvage Materials, which NRG could exercise if it terminated the contract while Werner was in bankruptcy. Werner posted a $2 million letter of credit, upon which NRG could draw if Werner defaulted. The prime contract imposed no payment obligation on NRG after it conveyed title to the Salvage Materials.
The value of the Salvage Materials was a factor in the parties' respective rights and duties if NRG terminated the contract for cause. Werner would be liable for NRG's costs of completion, minus revenue NRG reasonably obtained for the remaining Salvage Materials. Werner would also be entitled to a credit for its pre-termination costs, minus revenue it realized from the Salvage Materials.
Four days after executing the prime contract, Werner subcontracted with BTU Solutions DE, LLC (BTU).[2] Essentially, BTU stepped into Werner's shoes to perform the prime contract. BTU initially projected that costs of roughly $4.5 million would generate $13 million in salvage-related revenue.
But, it did not turn out that way. BTU overestimated the amount of salvageable metal and equipment, and underestimated the cost of recovery. Some copper cable that BTU expected to find apparently already had been removed from the long-defunct station. Other cable was encased in asbestos and more costly than anticipated to salvage. Extraction of steel from the site was also more complicated than anticipated. Shortfalls in the revenue stream that BTU anticipated would fund its expenses, required BTU to borrow working capital, incurring additional costs.
Then, Superstorm Sandy hit in October 2012. The site filled with salt water, destroying otherwise salvageable equipment, dispersing asbestos throughout the site, and further complicating remediation. Several months thereafter, BTU entered into its *585 subcontract with Site Enterprises, Inc. (Site), which agreed to perform demolition work after the storm in return for $3.7 million.
BTU struggled to pay its subcontractors, including Site. On December 26, 2013, Site filed a lien claim for $450,000, asserting it had not been paid, and ceased work.[3]
*909 BTU did not begin selling significant quantities of Salvage Materials until 2014.[4]
In March 2014, BTU contracted for environmental consulting services from Creative Environmental Solutions Corp. (Creative). Before a year passed, Creative filed its lien claim on December 24, 2014 in the amount of $350,000. It was signed by Ross Sikarev. He was Creative's "financial director," a title he received at an informal dinner meeting with Creative's president, Victoria Drozdov. No formal meeting of Creative's board, amendment to its by-laws, or corporate resolution confirmed Sikarev's authority to sign a lien claim on Creative's behalf.
The NRG-Werner contract, and the Werner-BTU subcontract required Werner and BTU to ensure the project was lien-free. However, neither company paid Site's and Creative's lien claims.
After Site's lien filing, but before Creative's, BTU removed over 8000 tons of ferrous metal, for which it received $2,093,014.[5] After Creative's lien claim, BTU removed just 181 more tons of ferrous material. The record indicates that BTU received $29,418 in return.
Meanwhile, in April 2014, Werner submitted a change order for $52,427 for removing oil from the project. NRG approved it over a year later.
*586 Eventually, Creative filed an action to foreclose on its lien against NRG's property (No. A-0567-16). Thereafter, NRG and BTU filed a declaratory judgment action (No. A-5432-15) against Creative, Site and others, to establish that the lien fund was limited to $52,427, the change order amount. The trial court consolidated the two actions.
After motion practice, the trial court concluded that the lien fund was $2,093,014, rather than $52,427 as NRG contended. Furthermore, the judge rejected NRG's argument that Creative's lien was invalid because an authorized officer did not sign it. Consistent with those findings, the court granted Creative summary judgment in its action against NRG and BTU, entitling Creative to a lien of $350,604 plus interest, and entitling it to foreclose on NRG's property. The court denied NRG's cross-motions for summary judgment for a declaration that the lien fund was limited to $52,427. Although the court initially granted Creative's request for counsel fees under N.J.S.A. 2A:44A-15(a), the court vacated the order upon NRG's motion for reconsideration.
NRG and BTU[6] now jointly appeal the trial court's rulings concerning the value of the lien fund as to Site and Creative. They also appeal the trial court's ruling as to the propriety of Creative's signatory on its lien claim. Creative cross-appeals the denial of its motion for counsel fees. Site is solely a co-respondent and has not sought any affirmative relief on appeal.
II.
We exercise de novo review of the trial court's grant of summary judgment, and apply the same standard as the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330, 9 A.3d 882 (2010). Issues of statutory construction are likewise subject to our plenary review.
*910 Cashin v. Bello, 223 N.J. 328, 335, 123 A.3d 1042 (2015).
*587 We must interpret the CLL in a "nuanced way." See Craft v. Stevenson Lumber Yard, Inc., 179 N.J. 56, 67, 843 A.2d 1076 (2004). It is "something of an overstatement" to simply say we must strictly construe the statute because it is in derogation of common law. Ibid. [7] We must read the statute "sensibly," mindful of its underlying goals and policies. Id. at 68, 843 A.2d 1076 ; see also Thomas Group, Inc. v. Wharton Senior Citizen Hous., Inc., 163 N.J. 507, 517, 750 A.2d 743 (2000).
We are also guided by more general principles of statutory construction that require us to discern the Legislature's intent by focusing first on the plain language of the statute. If the meaning is plain, our job is done. In re Kollman, 210 N.J. 557, 568, 46 A.3d 1247 (2012). However, if it is not, we may resort to extrinsic legislative materials for guidance. Ibid. We may also consider such materials if the plain meaning would lead to an absurd result, State v. Harper, 229 N.J. 228, 237, 160 A.3d 1281 (2017), or would violate "the overall statutory scheme ...." DiProspero v. Penn, 183 N.J. 477, 493, 874 A.2d 1039 (2005).
There are two, sometimes competing, goals of the CLL: to provide a source of security to those who provide construction services and materials, and to protect property owners who have met their obligations.
The main purpose of the CLL-to help secure payment to contractors, subcontractors, and suppliers who provide work, services, material, or equipment pursuant to a written contract-is achieved by empowering them to file lien claims and thus protect the value of the work and materials they have provided. A secondary goal of the Act is to ensure the rights of property owners who have met their financial obligations and to preclude imposing upon them the burden of double payment for work and materials.
[ Craft, 179 N.J. at 68, 843 A.2d 1076 (citations omitted).][8]
*588 See also Legge Indus. v. Joseph Kushner Hebrew Acad., 333 N.J. Super. 537, 555, 756 A.2d 608 (App. Div. 2000) (stating that "[t]he Lien Law attempts to protect both the owner and the supplier," and a court must "balanc[e] the competing interests in the light of the [CLL's] apparent purposes").
The Court has recognized that the size, sophistication and "innocence" of parties varies. Craft, 179 N.J. at 78, 843 A.2d 1076. "[T]he mere status of the parties as owners versus contractors and suppliers does not weigh on the equity scale." Ibid. When the owner and lien-holding contractor are equally innocent in the case of a prime contractor's default, and they offer "equally plausible interpretations of the Act," a court may apply a "tie-breaker" that favors the contractor. Id. at 80-81, 843 A.2d 1076. However, if "one interpretation advances the principles undergirding the Act, and one does not, it is the better interpretation *911 that must prevail, regardless of the outcome." Id. at 81, 843 A.2d 1076.
Turning to the statutory language, in order to provide payment security to contractors and subcontractors, the CLL generally grants them a right to a lien, attached to the owner's real property, "for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price ...." N.J.S.A. 2A:44A-3(a). Lien claims pertain to a "written contract for improvement" of real property. N.J.S.A. 2A:44A-8 (Construction Lien Claim form). "Improvement" to real property includes "demolition or removal of any building or structure ...." See N.J.S.A. 2A:44A-2.[9]
But, the amount of the lien is tied to the owner's contractual payment obligation. "An amount of a lien on an interest of a person ... shall be limited to the amount that person agreed in *589 writing to pay, less payments made ... in good faith prior to the filing of the lien." N.J.S.A. 2A:44A-3(f). The lien claim "shall not exceed the unpaid portion of the [claimant's] contract price ...." N.J.S.A. 2A:44A-9(a).
A "[c]ontract" is a written agreement "evidencing the respective responsibilities of the contracting parties, including, but not limited to, price or other consideration to be paid, and a description of the benefit or improvement to the real property subject to a lien." N.J.S.A. 2A:44A-2. "Contract price" is the "amount specified in a contract for the provision of work, services, material or equipment." Ibid.
To protect the owner against double-payments, the lien fund is limited, for first or second tier claimants, to "the earned amount of the contract between the owner and contractor minus any payments" made before the claimant serves the lien. N.J.S.A. 2A:44A-9(b)(1). For third tier claimants, the lien fund is limited to the lesser of the lien fund for first or second tier claimants, or "the earned amount of the contract between the contractor and the subcontractor to the contractor, minus any payments" made before the claimant serves the lien. N.J.S.A. 2A:44A-9(b)(2). The " 'earned amount of the contract' is the contract price" if the party has completed performance; or "the value, as determined in accordance with the contract," of the partial performance provided. N.J.S.A. 2A:44A-9(e). "The contract price is the beginning point for a determination of the measure of a lien fund because it is within the four corners of that contract that the contractor, the subcontractors, and suppliers provide services or materials to enhance the value of the owner's property." Craft, 179 N.J. at 77, 843 A.2d 1076.
No lien fund exists if, when the lien is filed, the owner has "fully paid the contractor for the work performed or for the services, material or equipment provided." N.J.S.A. 2A:44A-9(d). "[T]he CLL remedy strikes a balance between the interests of owners, subcontractors and suppliers by securing payment from the moneys owed by the owner to the contractor."
*590 Craft, 179 N.J. at 80, 843 A.2d 1076 (emphasis in original). If the owner owes no money to the contractor "no lien fund exists." Ibid.
On the other hand, the lien fund is not reduced by, among other things, "payments yet to be earned upon lodging for record of the lien claim ...." N.J.S.A. 2A:44A-9(c)(2). The CLL is not intended *912 "to permit a property owner to defeat a supplier's lien claim by knowingly or negligently advancing payments to the contractor that are not due." Craft, 179 N.J. at 70, 843 A.2d 1076 ; see AEG Holdings, LLC v. Tri-Gem's Builders, Inc., 347 N.J. Super. 511, 515, 790 A.2d 954 (App. Div. 2002) (stating "a property owner's maximum liability is not reduced by payments made to the contractor that were not earned and due before the subcontractor's lien was filed" (citing Legge, 333 N.J. Super. at 547, 756 A.2d 608 ) ).
III.
A.
To resolve this appeal, we must ascertain how the CLL treats the value of salvage recovered from a demolition project.[10] The parties present plausible but competing interpretations.
Site asks rhetorically, "What contractor would do a multi-million dollar demolition and asbestos abatement for no money?" Site contends the gross revenue BTU realized from selling the Salvage Materials set the contract price in the prime contract. Site and Creative argue, since NRG transferred title to the Salvage Materials before significant work began, it constituted a prepayment that did not reduce the lien fund.
*591 NRG does not dispute that the right to the Salvage Materials was contractual consideration for Werner's agreement to demolish the generating station and pay NRG $250,000. However, NRG rejects the notion that the Salvage Materials' ultimate resale value set the "price" NRG paid. NRG contends that the NRG-Werner contract defines the lien fund. NRG contends non-monetary consideration is not payment. Until NRG agreed to the change order, it "agreed to pay" nothing. See N.J.S.A. 2A:44A-3(f). Also, according to NRG, the "contract price" and the "earned amount of the contract," which define the size of a lien claim, were zero. N.J.S.A. 2A:44A-9(a), -9(b).
Supporting Site's and Creative's position, the CLL evidently recognizes non-monetary consideration in defining a "contract." A "contract" is an agreement evidencing the contracting parties' "respective responsibilities," including "price," which apparently refers to monetary amounts, "or other consideration to be paid," which may refer to non-monetary consideration like salvage. N.J.S.A. 2A:44A-2 (emphasis added). "Contract price" in turn means "the amount specified in a contract," ibid., which arguably incorporates such non-monetary consideration. "Contract price" then defines the size of the lien claim. The CLL grants a lien "for the value of the work or services performed, or materials or equipment furnished in accordance with the contract and based upon the contract price...." N.J.S.A. 2A:44A-3(a) (emphasis added). Also, "[t]he amount of a lien claim shall not exceed the unpaid portion of the contract price of the claimant's contract for the work, services, material or equipment provided." N.J.S.A. 2A:44A-9(a) (emphasis added).
Yet, in support of NRG's position, the CLL defines "lien fund" in monetary terms. It is "the pool of money from which one or more lien claims may be paid." N.J.S.A. 2A:44A-2 (emphasis added). The *913 CLL requires contractors to file claims that "substantially" adhere to a prescribed form, which describes the contract price solely in terms of dollars. See N.J.S.A. 2A:44A-8 (Construction Lien Claim form, ¶4). Monetary payments are also implied by *592 use of the word "amount" in the provision limiting the "amount of a lien" on an owner's property "to the amount [the owner] agreed in writing to pay, less payments made ...." N.J.S.A. 2A:44A-3(f). Likewise, the "lien fund shall not exceed ... the earned amount of the contract between the owner and the contractor" in the case of first or second tier claimants. N.J.S.A. 2A:44A-9(b)(1).
The import of Site's and Creative's contentions is that salvage constitutes a form of payment by the owner that enhances the lien fund.[11] The NRG-Werner contract apparently presents an atypical (but possibly recurrent) case-in which the contractor deems the salvage so valuable that the contractor is willing to pay the owner for the right to undertake a demolition project. However, Site's and Creative's reasoning would presumably apply to any case in which salvage is transferred, even if it comprises a far less substantial portion of the total consideration.[12] In such a case, the value of salvage would still enhance both the total contract price and the lien fund calculation.
B.
We resolve the facial ambiguity in the statute in the subcontractors' favor. To reach that result, we need not rely solely on the established "tie-breaker" principle favoring contractors. See Craft, 179 N.J. at 80, 843 A.2d 1076.[13] Deeming the value of the Salvage Materials an element of the contract price is consonant with the *593 CLL's dual goals. It vindicates the interest of contractors, subcontractors and suppliers in receiving payment for the value of their work. In the extreme case before us, salvage was the only form of payment (putting aside the modest change order). As Site aptly noted, Werner and BTU did not agree to perform the work for free.
Including salvage value as part of the contract price and the lien fund also need not disserve an owner's interest in avoiding double-payment, so long as the owner takes appropriate measures to avoid premature transfer of salvage value. NRG could have transferred title to salvage as the contract progressed, or withheld transfer until the project's completion, or withheld transfer at least until salvage was actually recovered and ready for resale.[14] NRG could have taken steps to protect subcontractors like Site, which claimed it performed $450,000 of uncompensated work before BTU sold the lion's share of Salvage Materials. Instead, NRG prepaid the entirety of the consideration owed *914 Werner at the outset of the contract's performance.[15]
We acknowledge the total amount and value of the salvage was uncertain at the time of contract, and remained uncertain throughout the project.[16] It would have been difficult for NRG to calculate *594 what amount of interim payments of salvage to transfer commensurate with partially completed work. Thus, deeming salvage value part of the contract price would inject a level of complexity and uncertainty that is at odds with one of the CLL's fundamental goals. See Thomas Group, 163 N.J. at 516, 750 A.2d 743 (stating that CLL was designed "to simplify the lien-filing process"); see also Study Commission at 3 (expressing the goal "to remove uncertainty, lack of clarity and ambiguity" in current law and to establish rights that "clearly limited to specified amounts"); N.J. Practice, Construction Law § 12.48 (stating "[t]he price must be calculable from the terms of the contract").
Yet, the NRG-Werner contract reflects that the parties considered it practicable to assign a value to the Salvage Materials. In case of termination for cause, Werner was entitled to its costs minus its salvage-related revenue, and NRG was entitled to its costs of completion, minus revenue NRG reasonably obtained for the salvage that remained. We are mindful of the adage that "one man's (or woman's) junk is another's treasure." Certainly, an owner and contractor may value salvage differently. However, based on the provision addressing termination for cause, it is evident that both parties here accepted actual market value of the salvage as a common measure.
The primary equitable principle underlying the CLL is that a property owner should not enjoy the benefits of labor or materials without paying for them. See Craft, 179 N.J. at 68, 843 A.2d 1076 ; Thomas Group, 163 N.J. at 517, 750 A.2d 743 (referring to "the law's overall intent to permit contractors to file liens and thus protect the value of the work they have provided"). Site contends that subcontractors are not privy to the terms of contracts between owners and contractors, and was "in the dark" about the salvage-for-demolition arrangement in this case. If subcontractors are unaware of an unusual payment arrangement *595 like the one in the NRG-Werner contract, they are poorly positioned to protect themselves.
Although the lien fund is defined as a "pool of money," the over $2 million received for the salvage created such a pool. See N.J.S.A. 2A:44A-2 (defining "lien fund"). Furthermore, the "maximum amount for which [NRG] c[ould] be liable" included that value. Ibid. Hypothetically, had NRG removed copper or equipment from the site after it transferred title to Werner, or had NRG encumbered the salvage and impaired Werner's title, NRG would have been liable for an amount equal to its value. Although the Court observed that the CLL "secur[es] payment *915 [to contractors] from the moneys owed by the owner to the contractor," Craft, 179 N.J. at 80, 843 A.2d 1076 (emphasis in original) (citation omitted), the Court simply described a situation involving the typical form of consideration.
We reject NRG's contention that it owed nothing to Werner, simply because it owed it no money. Its contract clearly obliged it to transfer title to the Salvage Materials. The non-monetary "consideration to be paid"-the Salvage Materials-was the contract price. See N.J.S.A. 2A:44A-2 (defining "contract"). It was set forth "within the four corners" of the NRG-Werner contract. See Craft, 179 N.J. at 77, 843 A.2d 1076. The only reason why NRG owed nothing when Site and Creative performed their work was that NRG pre-paid Werner. See Legge, 333 N.J. Super. at 549, 756 A.2d 608.
The CLL's legislative history does not specifically address the issue of how to value salvage from demolition when it is part of the contract's consideration. However, we may infer an intent to consider salvage value as a form of consideration from the Legislature's rejection of statutory language that the Mechanic's Lien Law Study Commission recommended. The Commission proposed to limit the lien claim amount "to the contract price, or any portion therefore, for the work, services, material or equipment provided in accordance with the contract at the time of the filing of the lien, less the amount of salvage value of any recoverable material not *596 incorporated in the improvement." Study Commission, Appendix A at 9 (emphasis added). We understand that the highlighted language may have been meant to refer to unused materials brought onto a project site, as opposed to materials removed in demolition. Nonetheless, by rejecting the proposed reduction, the Legislature deemed the value of that form of salvage a part of a contractor's consideration. See State v. Crawley, 90 N.J. 241, 245-46, 447 A.2d 565 (1982) (inferring legislative intent from rejection of provision proposed by Criminal Law Revision Commission).
C.
Although we conclude that Salvage Materials' value is an element of the contract price, we part company with the trial court's calculation that the lien fund for both Site and Creative was $2,093,014.
We turn first to the contract price. By its $250,000 up-front payment, Werner effectively discounted the contract price-that is, the value of the Salvage Materials-by that $250,000 payment. Also, another $29,418 in metals were sold after BTU received the $2,093,014. Thus, the contract price was $1,872,432 ($2,093,014 + $29,418 - $250,000), before the change order. However, as NRG made those payments before they were earned-because NRG transferred title at the outset of the contract performance-they do not reduce the lien fund. See Craft, 179 N.J. at 70, 843 A.2d 1076 ; AEG Holdings, LLC, 347 N.J. Super. at 514-15, 790 A.2d 954 ; Legge, 333 N.J. Super. at 549, 756 A.2d 608.
Both Site and Creative were third tier lien claimants. A "third tier lien claimant" is "a subcontractor to a second tier lien claimant or a supplier to a second tier lien claimant." N.J.S.A. 2A:44A-2. A "second tier lien claimant" is a subcontractor or supplier to a contractor, who is in direct privity with the owner. Ibid.
Calculating the applicable lien fund required ascertaining the lesser of two amounts as of the time the lien claim was served. N.J.S.A. 2A:44A-9(b)(2). The first amount is the amount earned *597 under the contract between NRG and Werner (the first tier contractor). Although the total amount to be earned for completion of the *916 contract included the $1,872,432 net value of Salvage Materials, the lien fund calculation required calculating the work completed and amount earned when the lien claim was served.
As we have noted, the "earned amount of the contract" where performance was incomplete is "the value, as determined in accordance with the contract, of the work performed and services, material, or equipment provided." N.J.S.A. 2A:44A-9(e). However, the parties did not agree on a schedule of progress payments. Also, NRG prepaid the contract price. Therefore, the amount earned, or value of the work, reasonably depends on calculating the percentage of completion, and applying that to the net value of Salvage Materials. Although this amount would generally be reduced by payments made before the lien claim were filed, NRG's prepayments are excluded.[17]
Applying the same principles, the court must calculate the second amount, which is the amount earned under the contract between Werner and BTU, minus any payments Werner made to BTU, excluding prepayments. The court must compare the two amounts, and use the lesser as the measure of the lien fund.
The court must also calculate the lien fund for each claimant, if the "earned amount of the contract" increased during the period between Site's and Creative's filings. N.J.S.A. 2A:44A-9(f). In that *598 case, the lien fund available for Creative should be "calculated from the date of the increase." Ibid.
We note that NRG conceded that the lien fund should also include the $52,427 it agreed to pay in May 2015 for the removal of oil, pursuant to a change order. Since the oil was removed after Site served its claim, the amount appears to be relevant only to calculating the lien fund available to Creative. The lien fund is "the earned amount of the contract ... minus any payments made prior to service of a copy of the lien claim." N.J.S.A. 2A:44A-9(b) (emphasis added). We are constrained to remand for an appropriate calculation.
In sum, the value of the Salvage Materials enhanced the value of the lien fund. Although it was non-monetary consideration, it was an essential component of the price NRG agreed to pay, and the amount Werner earned for demolition of the generating station.
IV.
NRG separately contends that Creative's lien claim was invalid because Sikarev was not properly authorized to sign it. We agree.
Creative is a closely held New York corporation established in 1992. According to Victoria Drozdov, Creative's sole shareholder and president, Sikarev was appointed "Financial Director" about six months after he was hired. His appointment occurred at a dinner meeting with Victoria Drozdov and her husband Mark, a technical *917 director and corporate vice-president.[18] The appointment was not memorialized in any formal corporate writing.
Mark Drozdov said he considered Sikarev an officer, equivalent to a chief financial officer. Sikarev used the "Financial Director"
*599 title and also said he deemed himself an officer. He was a "very important person" in the company, according to Victoria Drozdov.
Claimants must file a lien claim "in substantially" the form the CLL prescribes. N.J.S.A. 2A:44A-8. "A lien shall not attach or be enforceable unless the lien claim ... is ... filed in the manner and form provided by this section and [ N.J.S.A. 2A:44A-8 ] ...." N.J.S.A. 2A:44A-6(b)(1) ; see N.J.S.A. 2A:44A-6(a)(1) (mandating "[t]he lien claim form as provided by section 8 ... shall be signed, acknowledged and verified by oath of the claimant ...."); see also N.J.S.A. 2A:44A-15(a) (stating that "[i]f ... the lien claim is not lodged for record in substantially the form ... in accordance with this act, the claimant shall forfeit all claimed lien rights ....").
Section 8 prescribes a form that requires a signatory to appear before a notary. N.J.S.A. 2A:44A-8. The notary must be satisfied that the signatory is "the Secretary (or other officer/manager/agent) of the Corporation (partnership or limited liability company)." N.J.S.A. 2A:44A-8 (Suggested Notarial for Corporate or Limited Liability Claimant) (emphasis omitted). The signatory must swear or affirm before a notary that he or she possessed "authority to act on behalf of the Corporation (partnership or limited liability company) ...." Ibid. The signatory "by virtue of its Bylaws, or Resolution of its Board of Directors (or partnership or operating agreement)" must have "executed" the lien claim. Ibid. [19]
*600 The CLL's procedural requirements were intended to be stringently applied. See N.J. Practice, Construction Law, § 12.38. The Mechanic's Lien Law Commission proposed adherence to one uniform form of lien. Study Commission at 23. Mindful of the "serious ramifications to the property owner" as well as the potential liability to a claimant who files an improper lien claim, the Commission proposed that only duly authorized officers, not mere agents, sign lien forms on behalf of corporations. Id. at 19-20. The original CLL required a signature by a "duly authorized officer" of a corporate lien claimant. L. 1993, c. 318, § 6.
Applying the original version of the statute, the Supreme Court "recognize[d] that harm to a corporation or its shareholders or prejudice to interested parties" could result when an individual, who "is not an *918 officer[,]" signs a lien form on behalf of a company. D.D.B. Interior Contr., Inc. v. Trends Urban Renewal Ass'n, Ltd., 176 N.J. 164, 170, 821 A.2d 1135 (2003). Based on equitable considerations and the Legislature's failure to define "duly authorized officer," the Court declined to invalidate a lien claim filed by an attorney whom a corporation authorized in writing to file a lien claim on its behalf as an attorney-in-fact. Id. at 169-70, 821 A.2d 1135. However, the Court held:
in the future when a corporation intends to appoint an attorney to sign, acknowledge and verify a lien claim, that corporation must comply with its certificate of incorporation and bylaws to ensure that the attorney executing those duties is a corporate officer. Execution of a power of attorney will be deemed inadequate to vest an attorney-in-fact with the authority of a "duly authorized officer ...."
[ Id. at 170, 821 A.2d 1135.]
Removing any uncertainty as to what was required to "duly authorize" an officer, the Legislature dropped the "duly authorized officer" language from section 6, and instead required compliance with the section 8 form, which requires authorization through by-laws or board resolution. See L. 2010, c. 119, § 3, codified at *601 N.J.S.A. 2A:44A-6 ; L. 2010, c. 119, § 5, codified at N.J.S.A. 2A:44A-8.[20]
Turning to Creative's lien claim, Sikarev described himself as an "officer/shareholder" of the corporation. The suggested notarial was modified to state that the notary was satisfied Sikarev was "an officer/shareholder" and "by virtue of [Creative's] Bylaws or Resolution of its Board of Directors ... executed" the lien claim.[21] However, Creative never amended its bylaws to designate Sikarev as an officer, nor did its Board adopt a resolution approving Sikarev's appointment. The record contains no other writing establishing his position.
We recognize that N.J.S.A. 2A:44A-8 requires that a lien claim "be filed in substantially the ... form" prescribed, and the reference to bylaws or a board resolution is found in what the section describes as a "suggested notarial." (Emphasis added). Yet, Creative's lien claim did not substantially conform to the prescribed form. Creative made no effort at all to adopt a bylaw, or a board resolution, appointing Sikarev to be a corporate officer; nor does the record reflect that Sikarev presented any other evidence of his appointment to the notary.
We do not interpret the reference to a "suggested" notarial statement to mean the notarial statement is optional. Section 6 requires that the "lien claim form as provided by section [2A:44A-8] shall be signed, acknowledged and verified by oath of the claimant setting forth ... the claimant's identity ...."
*602 N.J.S.A. 2A:44A-6(a)(1)(b). The word "suggested" evidently refers to the precise wording of the form. The notary's statement is designed to verify the signatory's identity and authority, as section 6 requires. Therefore, a corporate *919 signatory must present to the notary evidence of his authority as an officer by virtue of bylaws or board resolution. That was not done here.
As Creative did not memorialize Sikarev's appointment in its corporate bylaws or a board resolution, we need not address whether New York law permitted Creative to appoint an officer as "Financial Director" in the first place. We note that Creative relies on the authority of its "board [to] elect or appoint a president, one or more vice-presidents, a secretary and a treasurer, and such other officers as it may determine, or as may be provided in the bylaws." N.Y. Bus. Corp. Law § 715(a) (Consol. 2018) (emphasis added); but see Syracuse Television, Inc. v. Channel 9, Syracuse, Inc., 51 Misc.2d 188, 273 N.Y.S.2d 16, 28 (Sup. Ct. 1966) (holding that corporation's business manager was not an officer); American Express Co. v. Lopez, 72 Misc.2d 648, 340 N.Y.S.2d 82, 83 (Civ. Ct. 1973) (holding that chairman of the board of directors had authority to bind corporation, although "[a] chairman is not one of the usual officers designated in section 715 of the Business Corporation Law of New York" because the statute elsewhere "recognize[d] the existence of such an office and accept[ed] it for certain purposes as an alternative to the presidency" (citing N.Y. Bus. Corp. Law §§ 104, 508 (Consol. 2018) ) ).
Nor need we assess Creative's contention that New York corporation law recognizes the informal actions of closely held corporations. The issue is not whether, under New York law, Sikarev could bind his corporation based on an informal appointment over dinner.[22] We must ask whether he was appointed with sufficient *603 formality to qualify as a signatory of a lien claim under New Jersey law; and whether he presented evidence of that appointment to the notary. The answer to both questions is no.
In sum, we reverse the court's order finding Creative's lien was properly filed, and declare it invalid under N.J.S.A. 2A:44A-6 and -15. Particularly in light of that conclusion, Creative's cross-appeal from the court's order denying it attorney's fees warrants no discussion. R. 2:11-3(e)(1)(E). The court's order in that respect is affirmed.
Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

The trial court found the transfer occurred on May 10, 2012. The wire transfer actually reflects multiple dates, including April 13, and May 10.

The declaratory judgment complaint was filed on behalf of NRG and "BTU Solutions Group, LLC," although the BTU-Werner contract refers to "BTU Solutions DE, LLC."

The calculation of Site's lien claim is the subject of a separate lawsuit, presently awaiting decision in the trial court. The outcome of that lawsuit does not affect our analysis of the present appeals.

The sales were actually made by a subcontractor that BTU hired after Site ceased work; that subcontractor retained the revenue as its payment for work. However, for ease of reference, we will attribute the sales to BTU.

We have rounded numbers to the nearest dollar.

For convenience, we will refer to the two appellants as NRG, in discussing their arguments on appeal.

Thus, the Craft Court reconciled the competing canons that suggest strict construction because the statute is in derogation of common law, but liberal construction because it is remedial. The latter task is further complicated by the statute's multiple and sometimes competing remedial goals, as we note below.

The CLL in particular was also designed to remedy the shortcomings in the prior Mechanics Lien Law. See Thomas Group, 163 N.J. at 512-14, 750 A.2d 743 ; see also Report and Legislative Recommendations of the Mechanics' Lien Law Study Commission (Sept. 1982) 5-11; 41 Robert S. Peckar, N.J. Practice, Construction Law, § 12.38 (1998).

NRG does not dispute that the demolition increased the value of its property, and constituted an improvement that was lienable.

We leave for another day whether the principles we enunciate would apply equally to a renovation project, which we understand to involve partial destruction and improvement of an existing structure. See N.J.S.A. 2A:44A-2 (defining "[i]mprovement" to include "renovation"). We also do not address another form of "salvage"-the materials that a contractor may bring onto a site, but are unused or leftover in the process of construction.

Site avoids the issue whether the lien fund also includes the $52,427 change order, since the $2,093,014 amply covers its lien.

For example, the bidders who offered to undertake the demolition only if NRG paid them as much as $6.6 million may have also proposed to acquire title to the salvage. If so, the total price would have included both the cash payment and salvage value.

We assume the parties are equally "innocent." See Craft, 179 N.J. at 78-79, 843 A.2d 1076 (stating that "[i]n the absence of a claim of improper dealing" both the owner and lien-filing subcontractor were "innocent" for purposes of the Court's analysis, despite competing contentions that the other could have taken steps "that might have avoided this situation").

We acknowledge the possibility that a contractor would want to retain the salvage for later sale, or perhaps reuse it in its own projects. However, the market value of the salvage when recovered could be utilized.

Furthermore, NRG failed to enforce Werner's obligation to assure the project was lien-free, after Creative filed its lien, but before over $2 million in salvage was sold. Neither Site nor Creative contend they are third-party beneficiaries of Werner's promise.

We presume that the wide disparity in the bids NRG received reflected the difficulty in estimating the value of salvage in advance. Neither Site nor Creative contend the lien fund should be defined by a preliminary estimate of value. Notably, no estimate was incorporated in the NRG-Werner contract. As it turned out, the salvage value here was evidently far less than the cost of demolition. We recognize that different equitable considerations may apply if salvage value turns out to exceed expectations, and exceed the cost of construction or the increase in owner's property value. However, we confine ourselves to the facts before us.

As the issue was not briefed before us, we leave it to the trial court to determine, in the first instance, the appropriate measure of "percentage of completion." We note one conceivably might rely on the percentage of costs incurred, as compared to the total costs for completion. Cf. Zulla Steel, Inc. v. A & M Gregos, Inc., 174 N.J. Super. 124, 134, 415 A.2d 1183 (App. Div. 1980) (adopting "the percentage approach" to calculating damages incurred by contractor prevented from completing work); Goldman v. Shapiro, 16 N.J. Super. 324, 327, 84 A.2d 628 (App. Div. 1951) (stating, in case where contractor prevented from completing work, "the measure of the contractor's damages is generally, for the work actually performed, such a proportion of the entire price as the fair cost of that work bears to the fair cost of the whole work").

Mark and Victoria Drozdov said the meeting occurred in 2008. Sikarev made conflicting statements. He certified that he met the Drozdovs and became "Financial Director" in 2008, but testified in his deposition that he assumed the role in 2009.

The prescribed notary's statement states in full:
SUGGESTED NOTARIAL FOR CORPORATE OR LIMITED LIABILITY CLAIMANT:
On this --- day of ----- 20--, before me, the subscriber, personally appeared (person signing on behalf of claimant(s) ) who, I am satisfied is the Secretary (or other officer/manager/agent) of the Corporation (partnership or limited liability company) named herein and who by me duly sworn/affirmed, asserted authority to act on behalf of the Corporation (partnership or limited liability company) and who, by virtue of its Bylaws, or Resolution of its Board of Directors (or partnership or operating agreement) executed the within instrument on its behalf, and thereupon acknowledged that claimant signed, sealed and delivered same as claimant's act and deed, for the purposes herein expressed.
[N.J.S.A. 2A:44A-8 (emphasis omitted).]

The 2010 amendments generally followed recommendations of the New Jersey Law Revision Commission. N.J. Law Revision Comm'n, Final Report Relating to Construction Lien Law (Dec. 31 2009). However, the Law Revision Commission's comments did not expressly address this change. Ibid.

Since a virgule generally means "or," see Danco, Inc. v. Commerce Bank/Shore, N.A., 290 N.J. Super. 211, 217, 675 A.2d 663 (App. Div. 1996), Sikarev asserted he was an officer or a shareholder. However, Creative does not contend Sikarev was authorized to sign the form based on the status as a shareholder. The record evidence demonstrated that he certainly was not the latter; Victoria Drozdov was the sole shareholder.

We note that Leslie, Semple & Garrison, Inc. v. Gavit & Co., 81 A.D.2d 950, 439 N.Y.S.2d 707, 709 (1981), upon which Creative relies, held that a closely held corporation could not use its non-compliance with a corporate formality to avoid a contract it entered, as its avoidance would work an injustice on the other party. The court observed that the law did not intend "this shield for minority shareholders be converted to a sword to be wielded for the benefit of sole stockholders against third parties." Ibid. The case does not approve the informal actions of a corporation over the objection of third parties.